### Sanford and Genevieve Small v. Gifford Memorial Hospital, et al.

[349 A.2d 703]

No. 90-74

Present: **Barney, C.J., Smith, Daley, Larrow and Billings, JJ.**

Opinion Filed November 24, 1975

*Leighton C. Detora* of *Richard E. Davis Associates, Inc.*, Barre, for Plaintiffs.

*Miller & Hill*, Rutland, for Defendant.

**Barney, C.J.** This is a malpractice case. By the time this case went to the jury, the plaintiffs had discontinued against all parties except the defendant anesthesiologist. The operation involved elective surgery on the part of the plaintiff, Genevieve Small, to remove pendulous breasts which, because of their size and weight, were causing her severe discomfort and affecting her posture.

The operation itself was without incident, but for two or three days before discharge, Mrs. Small had a slight fever and felt nauseous. Six or seven days after the April operation, she felt better, but weak, and went home. About two weeks later, in May, after consulting a different doctor, she was readmitted to the hospital, and stayed a further sixteen days until she felt better and was again discharged. Her claim was that her difficulty arose from the use of halothane, commercially known as Fluothane, as an anesthetic. From it she claimed to have had hepatitis, a possibility about which she concededly was not informed when she consented to the surgery.

The jury returned a verdict for the defendant anesthesiologist, and the case was appealed to this Court. The only error claimed is that the judge failed to charge as requested by the plaintiffs on the issue of informed consent. There is no claim made that he did not charge the jury consistent with Vermont case law as it then stood. See *Pepin* v. *Averill*, 113 Vt. 212, 215, 32 A.2d 665 (1943); *Domina* v. *Pratt*, 111 Vt. 166, 13 A.2d 198 (1940).

Thus this Court is being asked to declare error in a trial on an issue submitted properly in terms of existing law with

respect to the standards of medical care and skill in this jurisdiction. Changes in the law come about in several ways. The most direct device is, of course, legislative action. But there are also changes through legal interpretation by appellate courts. Of these, the most abrupt are those announcements of new doctrine based on the United States Constitution by the United States Supreme Court. In view of the Supremacy Doctrine these must be applied to existing cases without regard to consequences. Then there are those changes which spring from the evolution of one judge-made rule into a better one. Although these are the changes which keep the common law vital and growing, they come about in a different manner.

The first function of a judicial tribunal is to do justice between the parties with respect to the dispute before the court. Especially in civil matters, reviewing courts are not disposed to implement changes without regard to the litigation before them. The rights of the parties are not to be disregarded in order that the case law of a state may be made more modern, more coherent or more popular.

Change can enter when it is demonstrated that a previous rule or doctrine works an injustice or infringes on crucial interests, or, perhaps, in an alternative, when such a change will not affect the rights of either party. In this case we are persuaded that changing our rule concerning informed consent at this time will do justice between these parties.

The informed consent issue raised by the plaintiffs' requests to charge, and now urged as error, is a new development in the law, and has several versions. It deals with the measure of a doctor's duty to inform the patient of the risks involved in the surgical procedure projected. It says, in effect, that that duty is measured by the right of a reasonable patient to be informed of the attendant risks in order to decide whether or not to undergo the treatment. Where the surgery is elective as in this case, the right of informed choice is of more significance. This rule is contrasted with the older rule that the doctor's duty to inform is akin to his standard of competence, that is, measured by the medical standards and customs in the community. The essential difference is that the proposed rule makes the extent of what a patient needs to know and ought to be told in order to intelligently consent to the proposed treatment a matter resolvable by a jury without expert medical

testimony. See Annot., 52 A.L.R.3d 1084 et seq. (1973) ; *New Trends in Informed Consent*, 54 Neb. L. Rev. 66 (1975).

Under either rule, medical testimony is essential to establish what the risks are. The new rule merely takes away from medical expertise the burden of establishing what the patient ought to be told about these risks. The rule also seems to recognize the need for medical judgment with respect to patients who are not mentally competent or emotionally equipped to face a discussion of such risks. Such an approach is consistent with what was said by this Court in *Largess* v. *Tatem*, 130 Vt. 271, 278, 291 A.2d 398 (1972) about the evaluation of lack of care.

Under the old rule, many cases failed because plaintiffs failed to make out a prima facie case that there was a deviation from standard local medical practice. This standard required plaintiffs to produce expert medical testimony as to the customary medical practice prevailing in the community. See, e.g., *Trogun* v. *Fruchtman*, 58 Wis.2d 596, 207 N.W.2d 297, 311 (1973). The consequence, under that rule, was a dismissal if such evidence was not forthcoming. As a rule, it is also complained of because it lets the medical profession set its own standards for informing patients. But in this case, the plaintiffs' cause was not dismissed, but went to the jury.

There was testimony from two doctors associated with the hospital in question that it was standard practice there to explain to a patient the risks of surgical procedures, including the risks from the administration of an anesthetic. Thus the jury had before it evidence to sustain an affirmative finding of a duty to inform even under the charge as given. The defendant anesthesiologist himself testified that Mrs. Small was not informed as to the alleged possibility of halothane hepatitis.

It is clear from the transcript that the real dispute did not center around informed consent. The defendants put in evidence from which the jury could find that there was and is no such condition as halothane hepatitis, and, of course, therefore no duty to inform the patient concerning it. The possibility of becoming sensitized to halothane was also argued and disputed in the evidence.

A secondary position of the defendants was that, even if there could be a hepatitis induced by halothane, Mrs. Small

did not have it. The medical evidence was that her condition was probably part of a post-operative depression due to the bilateral mastectomy plus a flare-up in the colitis condition she had had for years.

The doctor who testified on behalf of Mrs. Small was an osteopathic physician. It was his diagnosis in May that returned her to the hospital. He found her to then have a mild hepatitis, which was resolving. In June, after liver function studies, this doctor reported that the problem had its source in her colitis, and not her liver (hepatitis being a liver-related affliction). The hospital records he prepared showed no diagnosis of halothane hepatitis.

Some time later, after reviewing some medical literature and taped material concerning halothane (Fluothane) anesthesia, he concluded that he could, with reasonable medical certainty, diagnose her condition as hepatitis caused by halothane (Fluothane). This was the first time he had ever made such a diagnosis. He stated that the most important element leading to that diagnosis was that Mrs. Small had had Fluothane as an anesthetic about a month prior to her symptoms. He admitted he was not able to rule out other causes of her mild hepatitis, but that he felt that his diagnosis was, while not absolute, the most probable diagnosis that he could come up with after weighing everything.

It was developed that the symptoms of post-operative fever, nausea and general malaise were not specific, but could apply to colitis or even surgical trauma itself. He did feel that there was a slight yellowing of her eyeballs that was symptomatic of a hepatic condition. He conceded that colitis itself could generate a hepatitis. There was also evidence that surgery itself could "light up" a latent hepatitis.

There was a great deal of evidence about Mrs. Small's previous hospitalization and surgical experience. She had had halothane previously, and on one occasion had it when she thought she had had ether. All of the medical testimony agreed that there was nothing in her medical history to contra-indicate halothane as the anesthesia of choice. It was also agreed that ether, even if available, carried much greater risks for this patient and would not be the anesthesia of choice.

It can readily be seen that the jury had many factual issues for resolution. A determination in favor of the defendant on

any of them is sufficient to account for the verdict. Thus we are unable to say which issues the jury found persuasive. This leads to the conclusion that we are also unable to say whether or not the instruction of the judge limiting the responsibility of the anesthesiologist to disclose risks to the patient according to the prevailing medical practice in the community led the jury to improperly find for the defendant on this critical issue. Therefore, no matter how close or controverted the many factual issues may have been, since there was, on each, evidence to go to the jury, we must reverse on the grounds that the charge of informed consent can no longer be supported as the appropriate law for this jurisdiction. *Dodge* v. *McArthur*, 126 Vt. 81, 84, 223 A.2d 453 (1966) ; *Thompson* v. *Town of Stannard*, 125 Vt. 140, 144, 211 A.2d 253 (1965).

It is the view of this Court that it is the duty of the physician, in terms of informed consent, to give to a patient whose situation otherwise permits it all information material to the decision to undergo the proposed treatment. This is particularly true in cases of elective surgery, such as we have here. The burden would be on the patient to show, as was done in this case, that such material information was not furnished. In defense, the physician should be permitted to show that adequate and justifiable grounds existed for non-disclosure. Examples of that might be the youth or mental condition of the patient, the emergency nature of the situation, or the fact that the risk was literally unknown to the profession at the time. See *Trogun* v. *Fruchtman, supra,* 207 N.W.2d at 314–15.

Although, as we have said, medical testimony may be required to establish the existence of certain medically technical or obscure risks, it is not necessary to establish the patient's informational needs. *Cobbs* v. *Grant*, 8 Cal.3d 229, 104 Cal. Rptr. 505, 514 (1972). Thus the reference to the medical community's practice as a standard by which the sufficiency of the information furnished is measured is unduly restrictive. The materiality of the information furnished is measured by the significance a reasonable person in what the physician knew or should have understood to be the patient's position would have attached to the risks involved.

Although the evidence relative to the differing response by the particular patient had he or she received the information as to the risks involved has relevance as to proof of causation, necessary to support recovery, that patient's reaction is not the governing one with respect to the duty to inform. On that issue the standard is what a reasonable patient would have consented to or refused in such circumstances. This is a burden we regularly impose upon juries in negligence. *LaFaso* v. *LaFaso,* 126 Vt. 90, 96, 223 A.2d 814 (1966).

Succinctly put, the physician's duty is to furnish information that he has, or should have, that is material to intelligent choice by a reasonable person situated as was the patient; his failure to furnish such information is negligence, causative if it results in consent otherwise not forthcoming, and is the source of liability for harm resulting from the undisclosed risk.

*Reversed and remanded.*