KATIE SUE SARD ET VIR *v.* ERVING D. HARDY

[No. 11, September Term, 1977.]

*Decided November 9, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ORTH, JJ.

*Lawrence P. Pinno, Jr.*, with whom were *Joseph F. Lentz, Jr.*, and *Lentz & Hooper* on the brief, for appellants.

*George J. Goldsborough, Jr.*, with whom were *Goldsborough, Franch & Collett* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

The central issue on this appeal is whether appellants, Katie Sue Sard and David Penn Sard, Jr., presented legally sufficient evidence to permit a jury to decide whether appellee, Dr. Erving D. Hardy, a physician specializing in obstetrics and gynecology, was negligent in failing to advise the Sards that a tubal ligation, the sterilization operation which he performed on Mrs. Sard, might not succeed in preventing future pregnancies and in failing to disclose alternative means of achieving the desired result. Resolution of this question requires that we address for the first time the so-called doctrine of informed consent. We also consider

here the question whether recovery may be allowed against a physician for breaching an express warranty of therapeutic result.

Appellants commenced this action in the Circuit Court for Talbot County, charging appellee with negligent performance of a bilateral tubal ligation upon Mrs. Sard in 1968. Specifically, the Sards alleged that appellee negligently failed to advise them that the surgical procedure employed by him was not absolutely certain to succeed and that appellee failed to apprise the Sards of the potential results of the operation and alternative methods of sterilization, thereby precluding appellants from giving their informed consent. At the close of their case-in-chief, the trial judge directed a verdict for appellee on all counts.[1] A divided Court of Special Appeals affirmed in *Sard v. Hardy*, 34 Md. App. 217, 367 A. 2d 525 (1976). We then granted certiorari, and for reasons that follow, we reverse.

## I

In 1965, appellant Katie Sue Sard became pregnant for the first time. Toward the end of this pregnancy, she developed a dangerous condition known as eclampsia.[2] As a consequence, Mrs. Sard experienced a series of severe convulsions necessitating the premature delivery of her child by Caesarean section to save the lives of mother and child. The baby was dead at birth.

Mrs. Sard first consulted appellee in October, 1966, when she was pregnant with her second child. A normal, healthy

---

1. Appellants' amended declaration set forth a total of eight causes of action. Count I charged appellee with negligence in the actual performance of the sterilization. Count II asserted a claim under the informed consent doctrine. Count III charged appellee with negligence following the operation. Counts IV, V and VI sought damages on behalf of both plaintiffs for the claims alleged in the first three counts. VII charged breach of express warranty and Count VIII sought damages for that breach. As we have indicated, we are concerned here only with the informed consent and breach of express warranty issues, since appellants no longer press the two negligence claims.

2. Eclampsia is the occurrence of one or more convulsions, not attributable to other cerebral conditions such as epilepsy or cerebral hemorrhage, in a patient with preeclampsia. Preeclampsia is the development of hypertension due to pregnancy.

baby was delivered by Caesarean section early in 1967. Later that year, Mrs. Sard became pregnant for a third time, and again appellee supervised her pre-natal care. Sometime prior to the birth of her third child, Mrs. Sard and appellee discussed the possibility of sterilization. At trial, Dr. Hardy denied having warned Mrs. Sard that a future pregnancy would imperil her health, but admitted to having signed a consultant's report prior to the operation that contained the following statement:

> "The patient has been personally examined by me and I feel that future pregnancies would endanger her life. Sterilization is recommended for the following reason."

Appellee testified that he "felt this was a reasonable conclusion" and signed because of Mrs. Sard's prior experience with eclampsia and her decision "that she no longer wanted children."

As for Mrs. Sard, she testified to having been advised by appellee that she was about to undergo her third Caesarean delivery and that "usually people that have caesarean sections don't have no more than three." She further testified that since she had experienced severe complications in her earlier pregnancy, appellee had offered her three options: sterilization, oral contraception, or the use of an intrauterine device. Mrs. Sard also stated that she specifically informed appellee that she did not want more children because she had "lost a lot of blood" and "couldn't afford any more children." Mrs. Sard's husband testified that appellee never mentioned the possibility of vasectomy. Although unable to recall whether he had mentioned this latter alternative to appellants, Dr. Hardy testified that generally it was his practice to do so.

It is undisputed that appellee never informed appellants of the various methods of performing a tubal ligation that were available to him. He further testified that it was good medical practice for a physician merely to inform the patient of the fact that a tubal ligation was to be done without discussing the details of the surgical procedures

necessary to accomplish sterilization. Dr. Hardy stated that the final choice as to which of the various techniques to employ is generally made by the surgeon only after he has incised the abdomen and visualized the condition of the uterus.

Evidence at trial revealed that there were essentially six methods in common use in the United States employed to effectuate female sterilization by tubal ligation: Madlener technique; Pomeroy technique; Irving method; Uchida method; Aldridge method; and Erlich method. Evidence adduced through Dr. Hardy, who was called as an adverse witness by appellants, indicated that the Madlener technique used by appellee on Mrs. Sard, while the simplest to accomplish, had a 2% risk of failure when performed at the time of Caesarean section delivery. The Uchida and Irving methods, on the other hand, showed fail-rates of less than 1/10 of 1% under similar circumstances. Dr. Hardy acknowledged that he had never discussed the various methods with appellants prior to the operation. Nor did he explain to Mrs. Sard that the fail-rates for all of the procedures diminished dramatically when performed at some time other than Caesarean birth, thereby effectively denying her the option of undergoing sterilization at a later date with a correspondingly greater likelihood of success. Mrs. Sard testified that appellee never informed her that the operation might fail to eliminate completely the possibility of future pregnancy. Moreover, she testified, appellee had affirmatively assured her before the operation that she would not be having any more children. Despite this assurance and the performance of the tubal ligation, Mrs. Sard became pregnant for the fourth time, and in January, 1971, delivered her third healthy child by an uneventful Caesarean section.

Some 10 to 15 minutes before being wheeled into the delivery room for the Caesarean delivery and tubal ligation, Mrs. Sard had been handed a standard hospital consent form, which she signed without reading. In part, it provided:

"I/We understand what is meant by sterilization and I/We understand that if this operation is

successful, the above named patient will be unable in the future to produce children, but I/We understand that an operation intended to effect sterilization is not effective in all cases."

Previously, Mr. Sard, whose testimony revealed that he was functionally illiterate, had signed the same form. In directing a verdict for appellee on the informed consent court, the trial court ruled that the issue was conclusively settled against appellants, since, by signing the consent form, they had acknowledged their understanding that the sterilization procedure was not effective in all cases.

The Court of Special Appeals did not reach the issue decided by the trial court.[3] The majority first embraced the doctrine of informed consent declaring that a physician is under a "duty to make an adequate disclosure of substantial facts which would be material to the patient's decision." 34 Md. App. at 231. The court then went on to hold as a matter of law that a 2% risk of failure inherent in the Madlener method of tubal ligation would not be material to a reasonable person in the position of the patient here in deciding whether or not to undergo elective sterilization. 34 Md. App. at 235. The court also suggested that appellants' failure to produce evidence that Mrs. Sard would have refused the operation had she known there was a chance of failure might also have been a sufficient ground on which to sustain the directed verdict. *Id.*

## II

The doctrine of informed consent, which we shall apply here, follows logically from the universally recognized rule

---

3. In our view the effect to be given to a standard consent form is governed by the same principles used in evaluating appellants' claim under the informed consent doctrine. Thus, unless a person has been adequately apprised of the material risks and therapeutic alternatives incident to a proposed treatment, any consent given, be it oral or written, is necessarily ineffectual. *See, e.g.*, Pegram v. Sisco, 406 F. Supp. 776, 779 (W.D. Ark.), *aff'd*, 547 F. 2d 1172 (8th Cir. 1976). In any event, the authorization is simply one additional piece of evidence for the jury to consider in assessing the merits of appellants' cause of action for informed consent. *See* Garone v. Roberts' Technical & Trade School, 47 App. Div.2d 306, 366 N.Y.S.2d 129, 133 (1975).

that a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient. *Mohr v. Williams*, 95 Minn. 261, 104 N. W. 12, 15 (1905); *see McClees v. Cohen*, 158 Md. 60, 62-63, 148 A. 124 (1930); Powell, *Consent to Operative Procedures*, 21 Md. L. Rev. 189 (1961). In order for the patient's consent to be effective, it must have been an "informed" consent, one that is given after the patient has received a fair and reasonable explanation of the contemplated treatment or procedure. *Kenny v. Lockwood*, [1932] 1 D.L.R. 507, 520 (Ont. 1931).

The fountainhead of the doctrine of informed consent is the patient's right to exercise control over his own body, at least when undergoing elective surgery, by deciding for himself whether or not to submit to the particular therapy. As Judge Cardozo said for the New York Court of Appeals in *Schloendorff v. Society of N. Y. Hospital*, 211 N. Y. 125, 105 N. E. 92, 93 (1914), "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body." Other courts have bottomed the physician's duty to disclose on the fiducial quality of the physician-patient relationship. *Miller v. Kennedy*, 11 Wash. App. 272, 522 P. 2d 852, 860 (1974), *aff'd per curiam*, 85 Wash. 2d 151, 530 P. 2d 334 (1975); *Woods v. Brumlop*, 71 N. M. 221, 377 P. 2d 520, 524 (1962). Whatever its source, the doctrine of informed consent takes full account of the probability that unlike the physician, the patient is untrained in medical science, and therefore depends completely on the trust and skill of his physician for the information on which he makes his decision. *Cobbs v. Grant*, 8 Cal. 3d 229, 104 Cal. Rptr. 505, 502 P. 2d 1, 9 (1972).

Simply stated, the doctrine of informed consent imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment. *Salgo v. Leland Stanford Jr.*

*Univ. Bd. of Trustees*, 154 Cal. App.2d 560, 317 P.2d 170, 181 (1957); *Bang v. Charles T. Miller Hospital*, 251 Minn. 427, 88 N.W.2d 186, 190 (1958); *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 227 N.W.2d 647, 654 (1975).

This duty to disclose is said to require a physician to reveal to his patient the nature of the ailment, the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives, and the risk of unfortunate consequences associated with such treatment. *Natanson v. Kline*, 186 Kan. 393, 350 P. 2d 1093, 1106, *rehearing denied*, 187 Kan. 186, 354 P. 2d 670 (1960); *Scaria v. St. Paul Fire & Marine Ins. Co.*, 227 N.W.2d at 653; 2 D. Louisell & H. Williams, *Medical Malpractice* ¶ 22.01 (1973). The law does not allow a physician to substitute his judgment for that of the patient in the matter of consent to treatment, *Collins v. Itoh*, 160 Mont. 461, 503 P. 2d 36, 40 (1972).

Beyond these general principles, there is considerable disagreement with respect to several important elements and attributes of the cause of action arising from a physician's failure to obtain the informed consent of his patient prior to performing an operation or treatment.[4] The major areas of dispute focus on: (1) the scope of the physician's duty to warn, that is, whether the duty is to be measured by a professional standard of care or a general reasonableness standard; (2) whether expert medical testimony is required to prove the standard of care; and (3) the appropriate test for proving causal connection between the failure to disclose and any resulting injury or damage.

---

4. We note in passing our approval of the prevailing view that a cause of action under the informed consent doctrine is properly cast as a tort action for negligence, as opposed to battery or assault. *See, e.g.*, Cobbs v. Grant, 8 Cal. 3d 229, 104 Cal. Rptr. 505, 502 P. 2d 1, 8 (1972); Perin v. Hayne, 210 N.E.2d 609, 618 (Iowa 1973); Downer v. Veilleux, 322 A. 2d 82, 89-90 (Me. 1974); Trogun v. Fruchtman, 58 Wis. 2d 569, 207 N.W.2d 297, 311-13 (1973). *But see* Shetter v. Rochelle, 2 Ariz. App. 358, 409 P. 2d 74, 82 (1965), *modified on other grounds*, 2 Ariz. App. 607, 411 P. 2d 45 (1966) (surgery performed without a patient's informed consent is a technical battery).

## III

From the earliest pronouncements of the doctrine of informed consent, courts have labored to delineate the scope of the physician's duty to disclose. In an early California decision which exerted considerable influence on the development of the law throughout the country, the court stated:

> "A physician violates his duty to his patient and subjects himself to liability if he withholds *any facts which are necessary to form the basis of an intelligent consent by the patient* to the proposed treatment. Likewise the physician may not minimize the known dangers of a procedure or operation in order to induce his patient's consent." *Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees,* 317 P. 2d at 181 (emphasis added).

This apparent requirement of full disclosure, however, has yielded two competing rules. One line of cases has adhered to a professional standard of care, under which the physician's obligation to disclose is a matter committed to professional judgment and discretion. *Starnes v. Taylor,* 272 N. C. 386, 158 S.E.2d 339, 344 (1968). According to this view, whether a physician has breached his duty to disclose is determined by what risks a reasonable medical practitioner would have disclosed under the same or similar circumstances. *Roberts v. Young,* 369 Mich. 133, 119 N.W.2d 627, 630 (1963); *Aiken v. Clary,* 396 S.W.2d 668, 675 (Mo. 1965). Thus, the measure of liability is no different from that applied in the usual medical malpractice case founded on negligent treatment or diagnosis.

Proponents of a professional standard of care assert that only a physician is capable of estimating the potential psychological impact that risk disclosure would have on a particular patient. *See, e. g., Patrick v. Sedwick,* 391 P. 2d 453, 458 (Alaska 1964); *Grosjean v. Spencer,* 258 Iowa 685, 140 N.W.2d 139, 144 (1966); *Longmire v. Hoey,* 512 S.W.2d 307, 310 (Tenn. App. 1974). They maintain that in deciding

whether and how much to disclose prior to treatment, a medical practitioner must consider the state of his patient's health, the condition of his heart and nervous system, his mental state, and whether the risks involved are mere remote possibilities or hazards which occur with appreciable regularity. *Aiken v. Clary*, 396 S.W.2d at 674. Furthermore, it is argued, to hold physicians to a general standard of care with respect to disclosure would interfere with the flexibility a doctor must have in determining what therapy would best suit his patient's needs. *Ross v. Hodges*, 234 So. 2d 905, 909-10 (Miss. 1970); *Butler v. Berkeley*, 25 N.C. App. 325, 213 S.E.2d 571, 581-82 (1975).

In recent years, however, an ever-expanding number of courts have declined to apply a professional standard of care in informed consent cases, employing instead a general or lay standard of reasonableness set by law and independent of medical custom. These decisions recognize that protection of the patient's fundamental right of physical self-determination — the very cornerstone of the informed consent doctrine — mandates that the scope of a physician's duty to disclose therapeutic risks and alternatives be governed by the patient's informational needs. Thus, the appropriate test is not what the physician in the exercise of his medical judgment thinks a patient should know before acquiescing in a proposed course of treatment; rather, the focus is on what data the patient requires in order to make an intelligent decision. *Canterbury v. Spence*, 464 F. 2d 772, 785 (D.C. Cir.), *cert. denied*, 409 U. S. 1064 (1972); *Fogal v. Genesee Hospital*, 41 App. Div.2d 468, 344 N.Y.S.2d 552, 559 (1973); *Wilkinson v. Vesey*, 110 R. I. 606, 295 A. 2d 676, 688 (1972); *Miller v. Kennedy*, 522 P. 2d at 861; *Scaria v. St. Paul Fire & Marine Ins. Co.*, 227 N.W.2d at 653.

It is indeed questionable whether a professional standard of disclosure can be said to exist at all. But even where it may exist, it is apt to be so vague and nebulous as to endow the medical community with virtually absolute discretion in fixing the standard for adequate disclosure. *Canterbury v. Spence*, 464 F. 2d at 783; Comment, *Informed Consent in Medical Malpractice*, 55 Cal. L. Rev. 1396, 1404 (1967); Note,

75 Harv. L. Rev. 1445, 1447 (1962). As the California Supreme Court stated in *Cobbs v. Grant*, 502 P. 2d at 10:

> "Unlimited discretion in the physician is irreconcilable with the basic right of the patient to make the ultimate informed decision regarding the course of treatment to which he knowledgeably consents to be subjected."

Once the physician has ascertained the risks and alternatives, and has communicated this information to the patient, it is the patient's exclusive right to weigh these risks together with his individual subjective fears and hopes and to determine whether or not to place his body in the hands of the surgeon or physician. No question requiring the exercise of medical judgment ever arises at this stage of the decision-making process. *Cobbs v. Grant*, 502 P. 2d at 10; *Getchell v. Mansfield*, 260 Or. 174, 489 P. 2d 953, 956 (1971).

A general standard for informed consent cases provides the patient with effective protection against a possible conspiracy of silence, wherever it may exist among physicians. *Wilkinson v. Vesey*, 295 A. 2d at 687; *Cooper v. Roberts*, 220 Pa. Super. 260, 286 A. 2d 647, 650 (1971). Moreover, since the patient must suffer the consequences, and since he bears all the expense of the operation and post-operative care, fundamental fairness requires that the patient be allowed to know what risks a proposed therapy entails, alternatives thereto, and the relative probabilities of success. *Dunham v. Wright*, 423 F. 2d 940, 945 (3d Cir. 1970) (applying Pa. law); Comment, *Informed Consent in Medical Malpractice*, 55 Cal. L. Rev. 1396, 1409 (1967).

We think, then, that the proper test for measuring the physician's duty to disclose risk information is whether such data will be material to the patient's decision:

> "The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is whatever is material to the decision. Thus, the test for determining whether a potential peril must be

divulged is its materiality to the patient's decision."
*Cobbs v. Grant,* 502 P. 2d at 11.

By focusing on the patient's need to obtain information pertinent to the proposed surgery or therapy, the materiality test promotes the paramount purpose of the informed consent doctrine — to vindicate the patient's right to determine what shall be done with his own body and when.

We hold, therefore, that the scope of the physician's duty to inform is to be measured by the materiality of the information to the decision of the patient. A material risk is one which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure. *Miller v. Kennedy,* 522 P. 2d at 863 ("when a reasonable person in the patient's position probably would attach significance to the specific risk in deciding on treatment, the risk is material and must be disclosed."); *Getchell v. Mansfield,* 489 P. 2d at 956; *Wilkinson v. Vesey,* 295 A. 2d at 689; Waltz & Scheuneman, *Informed Consent to Therapy,* 64 Nw. U. L. Rev. 628, 640 (1970). Whether a physician has fulfilled his duty to disclose, then, is to be determined by reference to a general standard of reasonable conduct and is not measured by a professional standard of care.

Although the scope of disclosure is keyed to the patient's need to know facts that might influence his decision to undergo therapy, there are definite limits on what a physician must communicate to his patient. The physician need not deliver a "lengthy polysyllabic discourse on all possible complications. A mini-course in medical science is not required[.]" *Cobbs v. Grant,* 502 P. 2d at 11.

We stress that a physician is not burdened with the duty of divulging *all* risks, but only those which are material to the intelligent decision of a reasonably prudent patient. Even then, the physician retains a qualified privilege to withhold information on therapeutic grounds, as in those cases where a complete and candid disclosure of possible

alternatives and consequences might have a detrimental effect on the physical or psychological well-being of the patient, or where the patient is incapable of giving his consent by reason of mental disability or infancy, or has specifically requested that he not be told. Likewise, the physician's duty to disclose is suspended where an emergency of such gravity and urgency exists that it is impractical to obtain the patient's consent. Finally, disclosure is not required where the risk is either known to the patient or is so obvious as to justify presumption of such knowledge, nor is the physician under a duty to discuss the relatively remote risks inherent in common procedures, when it is common knowledge that such risks inherent in the procedure are of very low incidence. Conversely, where the physician does not know of a risk and should not have been aware of it in the exercise of ordinary care, he is under no obligation to make disclosure. *Canterbury v. Spence*, 464 F. 2d at 788-89; *Small v. Gifford Memorial Hospital*, 133 Vt. 552, 349 A. 2d 703, 706 (1975); *Holt v. Nelson*, 11 Wash. App. 230, 523 P. 2d 211, 218, 69 A.L.R.3d 1235 (1974); *Scaria v. St. Paul Fire & Marine Ins. Co.*, 227 N.W.2d at 653. *See Cobbs v. Grant*, 502 P. 2d at 12; *Wilkinson v. Vesey*, 295 A. 2d at 689; Waltz & Scheuneman, 64 Nw. U. L. Rev. at 641-43. As in every informed consent case, the physician is free to introduce evidence of his compliance with the prevailing medical standard of care to explain his failure to disclose. But such proof is not conclusive; it is still for the jury to decide whether adherence to the professional standard should deprive a patient of his right of self-determination. *Wilkinson v. Vesey*, 295 A. 2d at 688; *Miller v. Kennedy*, 522 P. 2d at 863.

The Court of Special Appeals, following the modern trend, adopted the materiality test to define the scope of disclosure. We disagree with its holding, however, that the information withheld here by appellee would not, as a matter of law, have been material to the decision of a reasonable person in the position of Mrs. Sard.

First, there is evidence that appellee never directly disclosed to Mrs. Sard that the operation might not be 100%

successful regardless of what technique he employed; nor that other surgical methods would have been significantly more effective. What is more, Mrs. Sard testified that appellee had affirmatively assured her before the operation that she would not bear any more children after the sterilization. Evidence was also produced to the effect that Mrs. Sard elected to undergo sterilization because she was concerned about the possibility of damage to her physical well-being and the financial burden of raising a third child. Given these facts, a jury could have found that a reasonable person in Mrs. Sard's position would have attached considerable significance to the projected risk of failure for the tubal ligation, and therefore should have been informed of the risk of fertility.

Moreover, it is undisputed that appellee chose not to inform Mrs. Sard about the increased risk of failure inherent in sterilizations performed at the time of Caesarean delivery. She was therefore denied the opportunity of deciding whether to undergo sterilization at delivery or at a later time when the risk of failure would have been drastically reduced. The jury could reasonably have concluded that this information would have been of material significance to a woman desirous of permanently preventing childbirth in the most effective manner. Finally, there was evidence permitting the jury to find that Dr. Hardy did not discuss the possibility of vasectomy with either appellant, even though, as appellee himself acknowledged, it was customary for physicians to discuss this subject when consulted by patients about sterilization.

We hold only that all of this evidence, taken together, was sufficient in this sterilization case to warrant submission to the jury the question whether the information withheld in this case was material to the patient's decision.

IV

Our adoption of the materiality test for measuring the scope of the physician's duty to disclose virtually dictates our course in regard to the requirement of expert medical testimony. *See generally* Annot., 52 A.L.R.3d 1084 (1973).

Those courts which follow the professional standard of care rule uniformly require that the plaintiff establish by expert medical testimony the existence of a duty to disclose and a departure from the standard of care. *See, e.g., Riedisser v. Nelson,* 111 Ariz. 542, 534 P. 2d 1052, 1055 (1975); *Casey v. Penn,* 45 Ill. App.3d 573, 4 Ill. Dec. 346, 360 N.E.2d 93, 101 (1977); *Llera v. Wisner,* Mont., 557 P. 2d 805 (1976); *Ficklin v. MacFarlane,* 550 P. 2d 1295, 1297-98 (Utah 1976); *Bly v. Rhoads,* 216 Va. 645, 222 S.E.2d 783, 787-88 (1976), while courts applying the general standard of care impose no such requirement. *See, e.g., Canterbury v. Spence,* 464 F. 2d at 792; *Cobbs v. Grant,* 502 P. 2d at 10; *Zeleznik v. Jewish Chronic Disease Hospital,* 47 App. Div.2d 199, 366 N.Y.S.2d 163, 170 (1975); *Getchell v. Mansfield,* 489 P. 2d at 956; *Cooper v. Roberts,* 286 A. 2d at 651; *Wilkinson v. Vesey,* 295 A. 2d at 688; *Small v. Gifford Memorial Hospital,* 349 A. 2d at 706 (1975); *Miller v. Kennedy,* 522 P. 2d at 655; *Trogun v. Fruchtman,* 58 Wis. 2d 569, 207 N.W.2d 297, 315 (1973).

We regard as more persuasive the reasoning of the cases that require neither the scope nor the breach of the physician's duty to be established by expert medical testimony. Professors Harper and James have criticized the rule requiring expert testimony as "an unwarranted abdication of responsibility and of the individual's right to make an informed choice, to the medical profession." 2 F. Harper & F. James, *Law of Torts* 60-61 (Supp. 1968). If the foundation of the doctrine of informed consent is the patient's right to know and his right to physical self-determination, then logic requires that the standard of care applicable to physicians in disclosure cases not be drawn from medical practice and custom. In some instances, where a professional custom respecting disclosure does exist, it may have evolved to counterbalance the patient's right to know and to shift from the patient to the physician the decision of whether the particular surgery or therapy should be performed.

We are not to be understood as holding, however, that expert medical testimony can be dispensed with entirely in

cases of informed consent.[5] Such expert testimony would be required to establish the nature of the risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, the nature of available alternatives to treatment and whether or not disclosure would be detrimental to a patient. *Getchell v. Mansfield*, 489 P. 2d at 956; *Small v. Gifford Memorial Hospital*, 349 A. 2d at 705. Thus, in the case at hand, appellants would be required to produce expert testimony to show the nature of the various methods of sterilization or birth control available to them in 1967 (*i.e.*, tubal ligation, vasectomy, oral contraception); the nature of the specific operative procedures, if any, employed to effect sterilization by a particular method (*e.g.*, Madlener, Irving, Pomeroy, Uchida procedures); the respective failure rates for each of the methods and procedures, both when performed at the time of a Caesarean section and at other times; and the risk of harm to mother and child inherent in each available method or procedure. In addition, as we have indicated, nothing we say here is intended to prohibit the physician from presenting expert testimony as to the medical standard of care.

## V

The Court of Special Appeals indicated that appellants' failure to produce evidence of a causal nexus between appellee's alleged breach of his duty to disclose and Mrs. Sard's claimed damages might have served as an alternative basis for upholding the directed verdict. All courts recognizing the doctrine of informed consent require proof of proximate causation. The rule is that a plaintiff cannot recover under the doctrine unless he can prove by a

---

5. Nor does our holding here alter the rule that in medical malpractice cases founded on negligence, expert testimony is generally required to establish the applicable standard of care. Johns Hopkins Hospital v. Genda, 255 Md. 616, 622-23, 258 A. 2d 595 (1969). *But see* Thomas v. Corso, 265 Md. 84, 97-99, 288 A. 2d 379 (1972) (medical expert testimony may not be required where negligence is so obvious that common knowledge or experience of jurors is sufficient for them to recognize negligence from the facts).

preponderance of the evidence that he would not have given his consent to the proposed procedure had full and adequate disclosure been made at the time consent was originally given. *Karp v. Cooley,* 493 F. 2d 408, 422 (5th Cir.), *cert. denied,* 419 U. S. 845 (1974); *Aiken v. Clary,* 396 S.W.2d at 676; *Wilkinson v. Vesey,* 295 A. 2d at 690.

With respect to the proximate cause requirement, the principal dispute centers on whether causality is to be judged by a subjective test — what the patient himself would have done had adequate disclosure been made — or an objective test — what a reasonable person in the patient's position would have done had he been fully informed. A succinct statement of the objective test was set out in *Canterbury v. Spence,* 464 F. 2d at 791:

> "Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance. If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not."

*See also* Waltz & Scheuneman, 64 Nw. U. L. Rev. at 647.

The rationale commonly offered in support of the objective test is that if a subjective standard were applied, the testimony of the plaintiff as to what he would have hypothetically done would be the controlling consideration. Thus, proof of causation under a subjective standard would ultimately turn on the credibility of the hindsight of a person seeking recovery after he had experienced a most undesirable result. *Scaria v. St. Paul Fire & Marine Ins. Co.,* 227 N.W.2d at 647. Such a test puts the physician in "jeopardy of the patient's hindsight and bitterness." *Canterbury v. Spence,* 464 F. 2d at 790-91. Furthermore, in cases where the plaintiff dies as a result of an unforewarned collateral consequence, the subjective standard would bar recovery on an informed consent claim altogether. *Bowers v.*

*Garfield*, 382 F. Supp. 503, 506 (E.D. Pa.), *aff'd mem.*, 503 F. 2d 1398 (3d Cir. 1974). Significantly, the Kansas Supreme Court, despite its decision in *Natanson v. Kline*, 350 P. 2d 1093, generally recognized as the leading authority in support of the professional standard of care in cases of informed consent, nonetheless adopted in *Funke v. Fieldman*, 212 Kan. 524, 512 P. 2d 539, 550 (1973), the objective test enunciated in *Canterbury* for the causality requirement. Elsewhere, a growing number of jurisdictions have adopted the *Canterbury* objective test for causality, and this despite their disapproval of that case on other grounds. *See, e.g., Karp v. Cooley*, 493 F. 2d at 422 n. 18; *Hamilton v. Hardy*, 549 P. 2d 1099, 1100 (Colo. App. 1976). *See also Schroeder v. Lawrence*, Mass., 359 N.E.2d 1301, 1303 (1977). We adopt the same test here.

We hold, therefore, that the causality requirement in cases applying the doctrine of informed consent is to be resolved by an objective test: whether a reasonable person in the patient's position would have withheld consent to the surgery or therapy had all material risks been disclosed. If disclosure of all material risks would not have changed the decision of a reasonable person in the position of the patient, there is no causal connection between nondisclosure and his damage. If, however, disclosure of all material risks would have caused a reasonable person in the position of the patient to refuse the surgery or therapy, a causal connection is shown. Under this rule, the patient's hindsight testimony as to what he would have hypothetically done, though relevant, is not determinative of the issue.

Here, there was sufficient evidence of proximate cause to permit a jury to decide appellants' informed consent case. The same considerations which support an inference of materiality with respect to the scope of disclosure also support an inference of proximate causation in this case. Of particular import is the undisputed testimony of Mrs. Sard that her decision to undergo sterilization was prompted by fears that a subsequent pregnancy might endanger her health as well as her family's financial security. These concerns appear to have been substantiated by Dr. Hardy's

·own opinion of Mrs. Sard's condition. This evidence might well support an inference that appellant was especially concerned about avoiding any future complications and that she would have chosen that procedure which would best enable her to achieve her objectives. Thus, a jury could conclude that the effectiveness of the sterilization was of such importance to appellant or to a reasonably prudent person in her position that the failure to reveal data about risks of failure and more efficient alternative methods would have induced appellant to consent to the operation, while she would not have done so had adequate disclosure been made. The failure on the part of appellant to testify that she would have not so consented in the face of a full disclosure is not fatal to her claim. Under the objective standard, as we have said, the plaintiff's testimony on this point is relevant, but not controlling.

### VI

In directing a verdict for appellee on appellants' breach of express warranty claim, the trial judge ruled that recovery could not be allowed under this theory absent proof of a separate consideration to support the warranty. In affirming, however, the Court of Special Appeals recognized an alternative ground for liability, holding that:

> "[A]n alleged express warranty cannot be enforced as a warranty unless, (1) it was made before the operation was performed, and was relied upon by the patient in contracting for the service, *or*, (2) it was supported by a separate consideration." *Sard v. Hardy*, 34 Md. App. at 239 (emphasis added).

Thus, concluded the court, the trial judge was correct in directing the verdict, since neither a pre-operative warranty nor a separate consideration was established. We concur with the rule adopted by the Court of Special Appeals and affirm its holding.

Courts confronted with the question whether a physician may be liable in contract for breach of express warranty have agreed generally that a physician is not an insurer of

the success of his treatment and absent an express agreement, does not warrant or guarantee that he will effect a given result. *Coleman v. Garrison*, 349 A. 2d 8, 11 (Del. 1975). The argument against imposing contractual liability on the physician is that considering the unpredictability of medical results and the differences in individual patients, it is unlikely that the physician of integrity can in good faith promise a particular outcome. Also, some patients are prone subjectively to transform hopeful expressions of opinion into hard promises, particularly following an undesirable result. Threatened with potential litigation, therefore, the physician may see himself forced to practice "defensive medicine." The other view is that to deny contractual liability would be to relegate the patient to the physician who does not conform to the ordinary standard of candor.

Although some courts hold that liability against a physician founded on breach of express warranty requires proof of separate consideration, *Coleman v. Garrison*, 349 A. 2d at 11; *Rogala v. Silva*, 16 Ill. App.3d 63, 305 N.E.2d 571, 573 (1973); *Gault v. Sideman*, 42 Ill. App.2d 96, 191 N.E.2d 436, 441 (1963), we think the better rule, as did the Court of Special Appeals, is that which requires proof of separate consideration only where the alleged warranty is made post-operatively.[6] Where the warranty is made prior to the surgery or treatment, however, the patient may recover in contract by proving breach of an *express* warranty, *Custodio v. Bauer*, 251 Cal. App.2d 303, 59 Cal. Rptr. 463, 470-71 (1967); *Sullivan v. O'Connor*, 363 Mass. 579, 296 N.E.2d 183, 186 (1973); *see Bishop v. Byrne*, 265 F. Supp. 460, 463 (D. W. Va. 1967); *Herrera v. Roessing*, 533 P. 2d 60, 61-62 (Colo.

---

**6.** There was testimony by both appellants to the effect that they were assured by appellee *following* the tubal ligation that Mrs. Sard was *absolutely* sterile, and therefore that they could engage in sexual intercourse without fear of future pregnancies. Dr. Hardy did not flatly refute this discussion, but claimed merely to have informed appellants that Mrs. Sard "*should* not have to worry about getting pregnant." (emphasis added). In any event, since there is no evidence that appellee received a separate consideration to support liability for a post-operative warranty, the Court of Special Appeals was correct in holding that appellants could not recover for any assurances allegedly made following the surgery. Sard v. Hardy, 34 Md. App. 217, 239, 367 A. 2d 525 (1976).

App. 1975); *Guilmet v. Campbell*, 385 Mich. 57, 188 N.W.2d 601, 605 n. 1 (1971), in which event proof of a separate consideration is not required.

As we have intimated, however, a therapeutic reassurance, hopeful expression of opinion, or mere prediction of an expected outcome may be mistaken for an express warranty to effect a particular result. To strike a balance, then, in protecting both the public and the physician, we think an added safeguard is necessary, even though the patient alleges a pre-operative, express warranty. As the court said in *Sullivan v. O'Connor*, 296 N.E.2d at 186:

> "The law has taken the middle of the road position of allowing actions based on alleged contract, but insisting on *clear proof.* Instructions to the jury may well stress this requirement and point to tests of truth, such as the complexity or difficulty of an operation as bearing on the probability that a given result was promised." (emphasis added).

We, too, adopt the rule that although a patient may recover for breach of an express, pre-operative warranty to effect a particular result, despite the absence of a separate consideration, he may do so only upon proving by clear and convincing evidence that the physician did, in fact, make the alleged warranty.

In affirming the directed verdict, the Court of Special Appeals, as we have observed, relied on the absence of a pre-operative warranty. We also noted earlier, however, Mrs. Sard's testimony that she had been affirmatively assured by appellee before the operation that she would not have have any more children. The issue here is whether this testimony, standing alone, was sufficient evidence on which to submit to the jury appellants' contract claim that appellee had expressly warranted to them that Mrs. Sard would be sterile following the surgery. We think not, particularly in light of the requirement that the jury find the existence of the warranty by clear and convincing evidence. The bald statement attributed to appellee that Mrs. Sard would not

have any more children, though certainly relevant to the informed consent claim, as we indicated earlier, does not by itself rise to the level of a guarantee, and beyond a mere hopeful expression of opinion or prediction of an expected result.

Accordingly, the trial court acted properly in directing a verdict on the express warranty claims. Since the trial court erred in directing a verdict on the informed consent claims, however, appellants are entitled to a new trial on those two counts.

> *Judgment of the Court of Special Appeals reversed; remanded to that court with instructions to reverse the judgment of the Circuit Court for Talbot County and to remand for a new trial in accordance with this opinion; appellee to pay costs.*