338 S.E.2d 381

**Robert E. ADAMS, et al.**

v.

**Omar EL–BASH.**

**No. 16497.**

Supreme Court of Appeals of West Virginia.

Dec. 18, 1985.

Joshua I. Barrett & Rudolph L. DiTrapano, DiTrapano & Jackson, Charleston, for appellants.

Jerry N. Ragan, Wood, Grimm & Delp, Huntington, for appellee.

McHUGH, Justice:

This is an appeal from a final judgment order of the Circuit Court of Cabell County, West Virginia, entered on August 3, 1983, upon a jury verdict in favor of the defendant in a medical malpractice action. This Court has before it the petition for appeal, the record, and the briefs and argument of counsel.

The appellee, Dr. Omar El-Bash, performed a urethrotomy on the appellant, Robert E. Adams. Subsequent to the operation, Mr. Adams, became incontinent to a degree that made it necessary for him to wear diapers. Adams and his wife sued El-Bash, alleging that the operation was negligently performed, that El-Bash was liable both for negligence and for the commission of a battery because the operation was performed without an informed consent of the patient, and that Adams sustained permanent injuries[1] as a proximate result of El-Bash's negligence.

Following a trial of these issues on July 26–28, 1983, the jury returned a general verdict in favor of Dr. El-Bash. The appellants moved the trial court to set aside the verdict and grant a new trial. The appellants contended that the jury verdict was contrary to the weight of the evidence. In a supplement to the motion for new trial, the appellants asserted that newly discovered evidence, in the form of testimony by a physician (J.M. Bobbitt) who had treated Adams for many years prior to the treatment by El-Bash and who had not been located prior to the trial, would warrant a new trial. The motion was denied, and this appeal followed.

The appellants contend that the verdict of the jury, insofar as it found that Adams gave an informed consent to the operation, was contrary to the weight and preponderance of the evidence and must therefore be set aside. The appellants also contend that the revelation of newly discovered evidence entitled them to a new trial.[2]

Robert E. Adams suffered from strictures of his urinary tract since 1934, when at the age of eight, he was struck by a car. He sustained a rather severe fracture of the pelvic bone, which injury caused the further complications of a stricture, or narrowing due to the growth of scar tissue, of the urethra. For many years, Adams was periodically treated by Dr. John Bobbitt, a urologist, in Huntington. When such a stricture caused urine retention and pain, Dr. Bobbitt performed a procedure known as cystoscopy and urethral dilatation. This procedure entailed the use of a filiform that was inserted in the urethra to stretch and enlarge the narrowed passage. Generally, following the dilatation, Dr. Bobbitt inserted a catheter to empty Adam's bladder and to prevent swelling that might cause further narrowing and urine retention.

---

1. The following injuries were alleged: Pain and suffering, past and future; inability to carry on ordinary affairs; inability to retain urine which causes the plaintiff acute embarrassment in social and business circumstances; medical expenses, past and future; loss of income; impairment of earning capacity. Mrs. Adams alleged that she was injured by the loss of society, companionship, consortium and services of her husband.

2. There are two other assignments of error raised for the first time in appellants' brief: (1) That the court erred in refusing to give plaintiff's instruction no. 8, containing a "battery" theory of liability as an alternative to negligence; and (2) that the court erred in allowing "parol evidence" going beyond a signed consent form. Appellants did not object at trial, and neither ground was asserted as error in appellants' brief submitted to the trial court in support of the new trial motion. The trial judge was not given the opportunity to consider or rule on these issues. Also, the errors were not mentioned in the petition for appeal filed in this Court. Therefore, we will not address these issues. *See* syl. pt. 3, *Wells v. Roberts,* 167 W.Va. 580, 280 S.E.2d 266 (1981).

Recent office records of Bobbitt's treatment were introduced by El-Bash. They show that Adams had the dilatation procedure performed in 1970, 1971, 1976 and 1977. In 1979, Dr. Bobbitt retired and his practice was taken over by Dr. El-Bash. According to Adams' testimony, Dr. Bobbitt informed him of the retirement. When Adams experienced the same problem of pain and urine retention in August of 1979, he visited Dr. El-Bash, who performed, as Dr. Bobbitt had done previously, the procedure of cystoscopy, dilatation and catheterization. Four days after the procedure, Adams could not pass urine and was in extreme discomfort. He called Dr. El-Bash in the middle of the night. Adams was told to come to the hospital emergency room. Upon his arrival shortly after 1:30 a.m., he was given an injection to relieve his pain. Dr. El-Bash arrived 15 to 20 minutes later. What occurred thereafter was the subject of conflicting testimony.

Adams testified that El-Bash attempted, without success, to insert a catheter. Dr. El-Bash testified that he tried to perform a dilatation but was unable to insert the filiform. According to Adams' testimony, Dr. El-Bash scheduled surgery for 8:00 a.m. but said nothing about the nature of the procedure to be performed. Adams made no inquiry because he assumed that the same procedure that had been used previously would be performed again. Adams signed a hospital consent form, authorizing Dr. El-Bash to perform a "cystoscopy with dilatation."

Dr. El-Bash performed a urethrotomy, a procedure in which the physician uses an instrument called a urethrotome to excise scar tissue in the urethra. Dr. El-Bash testified that he told Adams and his wife, when he met with them during the night before the operation, that he was going to perform the urethrotomy, although he did not remember whether he actually used the word "urethrotomy." Mrs. Adams denied that El-Bash told her anything about an operation on that occasion. From the time of the operation, Adams has been incontinent, a condition, he alleged, that was caused by the urethrotomy.

## Informed Consent

In *Cross v. Trapp*, 170 W.Va. 459, 294 S.E.2d 446 (1982), we explored the various standards by which informed consent to surgery is measured. The disclosure that a physician must make to a patient was particularized in syl. pt. 2 of *Cross v. Trapp:*

A physician has a duty to disclose information to his or her patient in order that the patient may give to the physician an informed consent to a particular medical procedure such as surgery. In the case of surgery, the physician ordinarily should disclose to the patient various considerations including (1) the possibility of the surgery, (2) the risks involved concerning the surgery, (3) alternative methods of treatment, (4) the risks relating to such alternative methods of treatment and (5) the results likely to occur if the patient remains untreated.

We adopted the patient need standard of assessing informed consent. In syl. pt. 3 of *Cross v. Trapp, supra*, this Court held:

In evaluating a physician's disclosure of information to his or her patient, relative to whether that patient gave an informed consent to a particular medical procedure such as surgery, this Court hereby adopts the patient need standard, rather than physician disclosure standards based upon national or community medical disclosure practice. Pursuant to the patient need standard, the need of the patient for information material to his or her decision as to method of treatment, such as surgery, is the standard by which the physician's duty to disclose is measured. Under the patient need standard, the disclosure issue is approached from the reasonableness of the physician's disclosure or nondisclosure in terms of what the physician knows or should know to be the patient's informational needs. Therefore, whether a particular medical risk should be disclosed by the physician to the patient under the patient need standard ordinarily depends upon the existence and materiality of such risk with respect to the patient's decision relating to medical treatment.

In establishing our standard of informed consent, we relied on *Canterbury v. Spence,* 464 F.2d 772 (D.C.Cir.1972), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), and *Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014 (1977). In *Cross,* we noted that the *Canterbury* decision required proof of "a causal relationship between the physician's failure to disclose information to his patient and damage to the patient. 464 F.2d at 790." *Cross v. Trapp, supra,* 170 W.Va. at 465, 294 S.E.2d at 452. In further explanation of the causality requirement, we said:

> Finally, with respect to the problem of establishing proximate cause between the failure to disclose and injury, the court in *Sard* recognized the existence of two tests: (1) the 'subjective test,' i.e., what the patient himself would have done had adequate disclosure been made, and (2) the 'objective test,' i.e., what a reasonable person in the patient's position would have done had he been fully informed. 379 A.2d at 1024, 1025. In *Sard,* the court adopted the 'objective test' and stated as follows: 'We hold, therefore, that the causality requirement in cases applying the doctrine of informed consent is to be resolved by an objective test: whether a reasonable person in the patient's position would have withheld consent to the surgery or therapy had all material risks been disclosed. If disclosure of all material risks would not have changed the decision of a reasonable person in the position of the patient, there is no causal connection between nondisclosure and his damage. If, however, disclosure of all material risks would have caused a reasonable person in the position of the patient to refuse the surgery or therapy, a causal connection is shown. Under this rule, the patient's hindsight testimony as to what he would have hypothetically done, though relevant, is not determinative of the issue.' 379 A.2d at 1025.

*Cross v. Trapp, supra,* 170 W.Va. at 467, 294 S.E.2d at 454–55.

In adopting the "objective test" of proximate cause in an informed consent case,

the court in *Sard v. Hardy* recognized that the "objective test" had its origin in *Canterbury v. Spence, supra,* 464 F.2d at 790–91, where the court thoroughly explained its reasons for preferring the "objective" rather than the "subjective" test:

> It has been assumed that the issue is to be resolved according to whether the factfinder believes the patient's testimony that he would not have agreed to the treatment if he had known of the danger which later ripened into injury. We think a technique which ties the factual conclusion on causation simply to the assessment of the patient's credibility is unsatisfactory. To be sure, the objective of risk-disclosure is preservation of the patient's interest in intelligent self-choice on proposed treatment, a matter the patient is free to decide for any reason that appeals to him. When, prior to commencement of therapy, the patient is sufficiently informed on risks and he exercises his choice, it may truly be said that he did exactly what he wanted to do. But when causality is explored at a post-injury trial with a professedly uninformed patient, the question whether he actually would have turned the treatment down if he had known the risks is purely hypothetical: 'Viewed from the point at which he had to decide, would the patient have decided differently had he known something he did not know?' And the answer which the patient supplies hardly represents more than a guess, perhaps tinged by the circumstance that the uncommunicated hazard has in fact materialized.
>
> In our view, this method of dealing with the issue on causation comes in second-best. It places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk.
>
> Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the

patient's position would have decided if suitably informed of all perils bearing significance. If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not. The patient's testimony is relevant on that score of course but it would not threaten to dominate the findings. And since that testimony would probably be appraised congruently with the factfinder's belief in its reasonableness, the case for a wholly objective standard for passing on causation is strengthened. Such a standard would in any event ease the fact-finding process and better assure the truth as its product.

■ It was unnecessary for us, in *Cross v. Trapp*, to formulate a test of causality between the physician's failure to disclose material risks and the patient's injuries, because in that case, we set aside a verdict on the ground of instructional error related to the standard for evaluating the physician's disclosure. We find the reasoning in *Sard* and *Canterbury* persuasive, and we now adopt the following objective test: In cases applying the doctrine of informed consent, where a physician fails to disclose the risks of surgery in accordance with the patient need standard of disclosure and the patient suffers an injury as a result of the surgery, a causal relationship, between such failure to disclose information and damage to the patient, may be shown if a reasonable person in the patient's circumstances would have refused to consent to the surgery had the risks been properly disclosed.

In the majority of jurisdictions where the causality issue has been considered, the objective test has been applied. *See* Prosser and Keeton on The Law of Torts, § 32 at 191 (W. Keeton 5th ed. 1984).

In the case now before us, the jury was fully and properly instructed on the informed consent issue. Plaintiff's Instruction No. 9 was based directly on the patient need standard of *Cross v. Trapp, supra,* and also contained the causation test from

*Sard v. Hardy* and *Canterbury v. Spence,* that we have adopted.

■ In reviewing the trial record, we find no evidence of risk disclosure by Dr. El-Bash prior to the surgery. The appellants, therefore, carried their burden of proving that Dr. El-Bash did not make the disclosure required by the patient need standard of informed consent. However, the question of causation, i.e., whether a reasonable patient in the circumstances would have consented to the urethrotomy if all the material risks had been disclosed, was properly left for the jury to decide.

"Questions of negligence, due care, proximate cause and concurrent negligence present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them." Syl. pt. 6, *McAllister v. Weirton Hospital Co.,* 173 W.Va. 75, 312 S.E.2d 738 (1983).

There was no direct evidence presented on the causation issue. The jury was properly instructed and was free to draw reasonable inferences from its view of the circumstances and from the expert's opinions as to the nature of the risks associated with the urethrotomy.

" 'A verdict of a jury should not be set aside on the ground of insufficient evidence, where the sufficiency depends upon the credibility of witnesses and the reasonable inferences which may be drawn from the evidence.' Point 2 Syllabus, *Denoff v. Fama,* 102 W.Va. 494, 135 S.E. 578 [1926]." .Syl. pt. 1, *Raines v. Faulkner,* 131 W.Va. 10, 48 S.E.2d 393 (1947).

### Newly discovered evidence

The appellant's motion for a new trial on the grounds of newly discovered evidence was based on an affidavit of Dr. Bobbitt and an affidavit of Adams. The Bobbitt affidavit is not in the record, although it is represented by the appellants that the affidavit is faithfully reproduced in their brief. Assuming this to be true, the testimony of Dr. Bobbitt may have served to impeach

Dr. El-Bash and may also have added weight to other expert testimony concerning the inappropriateness of performing a urethrotomy. Adams' affidavit asserts that he was unable to locate Dr. Bobbitt prior to the trial.

The extent of the hearing on the motion for a new trial is not clear from the record. We are guided, however, by the following standard:

'A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side.' Syllabus point 1, *Halstead v. Horton*, 38 W.Va. 727, 18 S.E. 953 (1894).

Syllabus, *State v. Frazier*, 162 W.Va. 935, 253 S.E.2d 534 (1979).

The appellants have failed to establish that they exercised due diligence in attempting to locate Dr. Bobbitt. Moreover, testimony by Dr. Bobbitt, to the effect that the urethrotomy was not the proper type of treatment would have been cumulative. The appellants had presented the testimony of medical experts, Dr. Robert Siegel, who said that the urethrotomy was the wrong procedure and Dr. Hamil Clark Kessel, who said that the urethrotomy was unnecessary and was improperly performed. The appellee's expert witness, Dr. Stanley J. Kandzari, also testified that under certain circumstances, the urethrotomy would be inappropriate.

 Therefore, based on the limited record we have for review on this issue, we find the trial judge did not err in denying the motion for a new trial on the ground of newly-discovered evidence. The proferred evidence was not really new, in the sense that it was not within the plaintiffs' knowledge prior to trial. It would have been cumulative, and there was not an adequate showing that, even with due diligence, Dr. Bobbitt could not be located prior to trial. That the evidence may have been used to impeach Dr. El-Bash's testimony is not dispositive, because other parts of the *Frazier* test were not satisfied. *See State v. Stewart*, 161 W.Va. 127, 239 S.E.2d 777, 783 (1977).

For the foregoing reasons, the judgment order of the Circuit Court of Cabell County is affirmed.

Affirmed.