294 S.E.2d 446

Raymond CROSS and Lucy Cross

v.

D. C. TRAPP, M.D., and Ohio Valley Medical Center, Inc.

No. 15121.

Supreme Court of Appeals of West Virginia.

July 14, 1982.

Bogarad & Robertson, Martin S. Bogarad and William R. Kiefer, Weirton, for appellants.

O'Brien, Cassidy & Gallagher, Frank A. O'Brien, Jr. and Patrick Cassidy, Galbraith, Seibert, Kasserman, Farnsworth, Gillenwater & Glauser and Elba Gillenwater, Jr., Wheeling, for appellees.

McHUGH, Justice:

In this action we are asked to consider the requirements of a consent given by a patient prior to surgery. On a broader scale, we are asked to review a physician's duty to disclose to his patient methods of treatment, including surgery, and the risks incidental to such methods of treatment.

Specifically, this action is before this Court upon an appeal by the appellants, Raymond Cross and Lucy Cross, from judgments entered in the Circuit Court of Ohio County, West Virginia, in favor of the appellees, Dr. D. C. Trapp and Ohio Valley Medical Center, Inc. The action of the appellants, filed in circuit court in 1976, asserted that surgery upon the appellant, Raymond Cross, was performed without proper consent. This Court has before it the petition for appeal, all matters of record and the briefs and argument of counsel.

In September, 1974, Raymond Cross (hereinafter "appellant"), complaining of pain in his lower abdomen and bladder region, was referred by a physician to the appellee, Dr. Trapp, a urologist.

On October 8, 1974, the appellant was examined in the office of Dr. Trapp. The appellant's wife was present at that time although she did not witness the actual examination of her husband. The complaints of the appellant included soreness in the lower abdomen and groin areas and

problems with urination. Concluding that the appellant's trouble was in the prostate gland, Dr. Trapp suggested that the appellant be hospitalized.

On October 23, 1974, the appellant was admitted to Ohio Valley Medical Center. At the time of that admission to the hospital the appellant signed a form indicating that the appellant consented to diagnostic treatment and medical treament including surgery. As a result of the death of his father, the appellant left the hospital. On October 28, 1974, the appellant was readmitted to Ohio Valley Medical Center. At that time, the appellant signed a general consent form for medical treatment similar to the form he signed on October 23, 1974. During the period in question, no written consent was ever executed by the appellant reflecting that a specific type of treatment or surgery was to be performed.

On October 29, 1974, while the appellant was under anesthesia, Dr. Trapp conducted a cystoscopic examination of the appellant's urinary tract.[1] As a result of that examination, Dr. Trapp during the procedure performed upon the appellant a transurethral resection of the prostate gland.[2]

The appellant testified that he was displeased that the surgery had been performed. Moreover, subsequent to the surgery the appellant continued to have problems with urination. Furthermore, subsequent to the surgery, the appellant allegedly became impotent.

On October 22, 1976, the appellants, Raymond Cross and Lucy Cross, filed an action against the appellees in the Circuit Court of Ohio County, West Virginia. In their complaint, the appellants asserted that the operation of October 29, 1974, was performed without proper consent and, further, was performed in a negligent manner. Trial began in the circuit court on May 27, 1980. At the close of the appellants' case, the circuit court directed a verdict in favor of the appellee, Ohio Valley Medical Center, and the action was submitted to the

1. Cystoscopy involves a visual examination of the urinary tract. *Dorland's Illustrated Medical Dictionary* (25th ed. 1974).

2. A resection refers to an excision of a portion of an organ or other structure. *Ibid.*

jury upon the appellants' theory of lack of consent for the surgery, rather than upon negligence. The jury found in favor of the appellee, Dr. Trapp. By order entered on October 14, 1980, the post-trial motions of the appellants were denied.

In their appeal to this Court, the appellants ask that judgment be entered in their favor and against the appellees. In the alternative, the appellants request a new trial.

## I

■ Certainly, surgery cannot be performed by a physician without the consent of his patient. Annot. 89 A.L.R.3d 32 (1979); Annot. 88 A.L.R.3d 1008 (1978). As stated in Vol. 5A *Personal Injury*, Physicians and Surgeons § 1.02(1) (Matthew Bender 1980): "It is a recognized and accepted general rule that the consent of a patient is a prerequisite to treatment or to a surgical operation...." *See also* Landon, *Pollock's Law of Torts* (1939) at 124. Moreover, as stated in Vol. 13 Va.L.Rev. 505 (1927): "... [T]he general rule seems to be that a surgeon owes to his patient the duty not to operate upon the patient without his consent.... This duty is based upon the right of every adult human being, of sound mind, to determine what shall be done with his own body." (citations omitted). West Virginia has adopted the rule requiring a physician to secure the consent of his patient prior to the performance of an operation. As this Court stated in *Browning v. Hoffman*, 90 W.Va. 568, 581, 111 S.E. 492, 497 (1922): "Except in very extreme cases, a surgeon has no legal right to operate upon a patient without his consent, nor upon a child without the consent of its parent or guardian." (citations omitted).[3]

However, the problem in this area of the law is not simply whether the patient expressed his consent to medical treatment. Rather, in actions such as the one before this Court, the problem is whether the patient's consent to the procedure was an informed consent. Therefore, in determining the validity of a patient's consent to surgery, for example, courts have considered physician's statements to patients involving such matters as the possibility of surgery, the risks involved, alternative methods of treatment, the risks relating to such alternative methods, and the results likely to occur if the patient remains untreated.

In order to evaluate a physician's disclosure of information to his patient, relative to the issue of whether that patient gave an informed consent to a particular medical procedure, courts and legislatures have adopted various standards.[4] The three principal standards for disclosure are as follows: (1) the reasonable physician or national standard, (2) the community or local practice standard and (3) the patient need standard. *See* Annot. 88 A.L.R.3d 1008 (1978).

The reasonable physician or national standard simply measures the standard of physician disclosure by what a reasonable physician would disclose under the same or similar circumstances. 82 W.Va.L.Rev. 251 (1979). As that law review article states: "This system would substitute a national standard of reasonable and ordinary care for the traditional locality standard." 82 W.Va.L.Rev., *supra*, at 275. The reasonable physician or national standard is exemplified in *Charley v. Cameron*, 215 Kan. 750, 528 P.2d 1205 (1974), where in syllabus point 1 the court held: "Where disclosures of possible results of medical or surgical procedures have been made to a patient and are ascertainable, expert medical testimony is ordinarily necessary to establish that they were insufficient to accord with disclosures made by reasonable medical practitioners under the same or like circumstances."

**3.** The American rule requiring patient consent prior to surgery is consistent with legal principles found in England. As stated in Vol. 27 Halsbury, *The Laws of England*, Trespass (1913) at 874: "To perform a surgical operation on a person against his will or against the will of the

person entitled to give consent on behalf of the patient is an assault."

**4.** Florida, for example, has attempted to resolve the disclosure and consent issue by statute. *Fla. Stat.Ann.* § 768.46 (West 1975).

On the other hand, the community or local practice standard "... established the duty of the physician by the ordinary and reasonable disclosure practices of the average physician practicing in the same field in the same or similar communities." 82 W.Va.L.Rev., *supra*, at 275. The community standard was adopted in Virginia in the case of *Bly v. Rhoads*, 216 Va. 645, 222 S.E.2d 783 (1976). In *Bly* the court recognized that a physician has a general duty to disclose to patients alternatives to and risks of a particular treatment. The court stated that "[t]he Virginia 'same or similar community' standard is imbedded in the jurisprudential law of this Commonwealth...." 222 S.E.2d at 789.

A third standard, the patient need standard, relating to a physician's duty to disclose to his patient methods of treatment including surgery and the risks incidental to such methods, was adopted in the leading case of *Canterbury v. Spence*, 464 F.2d 772 (C.A.D.C.Cir.1972), *cert. den.* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). In *Canterbury*, the plaintiff consulted a neurosurgeon concerning back pain. Subsequent to various examinations, the surgeon told the plaintiff that surgery was necessary. The plaintiff did not object to the surgery and did not question the nature of the operation. The plaintiff's mother asked if the proposed operation was serious, and the surgeon replied that it was no more serious than any other operation. The testimony was contradictory as to whether the plaintiff's mother expressed her consent to the operation prior to the operation. A consent form was signed by the plaintiff's mother after the operation took place.

In *Canterbury*, after the surgery, while recovering normally, the plaintiff fell from his hospital bed while unattended by the hospital staff. A second operation upon the plaintiff became necessary with respect to which the plaintiff's mother signed another consent form. Ultimately, the plaintiff suffered from paralysis.

In *Canterbury*, the Court held that whether the surgeon's nondisclosure of possible paralysis relating to the surgery was reasonable was for the jury to decide, even though the evidence indicated that paralysis only occurred in one percent of such surgery cases. 464 F.2d at 794.

In the *Canterbury* decision a number of legal principles were recognized. Fundamentally, the Court recognized the right of every person to determine what shall be done with his or her own body, and the Court stated that it is the prerogative of the patient, not the physician, to determine the patient's best interests. 464 F.2d at 781. Furthermore, recognizing that a physician must secure his patient's consent prior to treatment, the Court stated that "... it is evident that it is normally impossible to obtain a consent worthy of the name unless the physician first elucidates the options and the perils for the patient's edification." 464 F.2d at 783. In that regard, the Court held that a physician's performance of his duty to disclose methods of treatment and the risks incidental to such methods is measured by that conduct which is reasonable under the circumstances. 464 F.2d at 785.

The most important aspect of the *Canterbury* decision, however, was its rejection of both the community standard and reasonable physician standard with respect to the scope of a physician's duty to disclose to his patient methods of treatment and the risks incidental to such methods. Rather, the Court adopted a rule of disclosure which we perceive to be more favorable to the patient. Under that rule, the need of the patient for information material to his decision as to method of treatment is the standard by which the physician's duty to disclose is measured. As the Court stated:

In our view, the patient's right of self-decision shapes the boundaries of the duty to reveal. That right can be effectively exercised only if the patient possesses enough information to enable an intelligent choice. The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is the information material to the decision. Thus, the test for determining whether a particular peril must be divulged is its materiality to

the patient's decision: all risks potentially affecting the decision must be unmasked.

. . . .

Optimally for the patient, exposure of a risk would be mandatory whenever the patient would deem it significant to his decision, either singly or in combination with other risks. Such a requirement, however, would summon the physician to second-guess the patient, whose ideas on materiality could hardly be known to the physician. That would make an undue demand upon medical practitioners, whose conduct, like that of others, is to be measured in terms of reasonableness. Consonantly with orthodox negligence doctrine, the physician's liability for nondisclosure is to be determined on the basis of foresight, not hindsight; no less than any other aspect of negligence, the issue on nondisclosure must be approached from the viewpoint of the reasonableness of the physician's divulgence in terms of what he knows or should know to be the patient's informational needs. If, but only if, the factfinder can say that the physician's communication was unreasonably inadequate is an imposition of liability legally or morally justified.

. . . .

From these considerations we derive the breadth of the disclosure of risks legally to be required. The scope of the standard is not subjective as to either the physician or the patient; it remains objective with due regard for the patient's informational needs and with suitable leeway for the physician's situation. 464 F.2d at 786 and 787.

In *Canterbury*, the Court stated that the topics demanding disclosure by the physician to the patient included: (1) the inherent and potential hazards of the proposed treatment, (2) the alternatives to that treatment, if any, and (3) the results likely if the patient remains untreated. 464 F.2d at 787. As the Court stated: "A very small chance of death or serious disablement may well be significant. . . ." 464 F.2d at 788.

The Court in *Canterbury* recognized that in certain emergency situations where harm from failure to treat is imminent or where the physical or emotional result of disclosure could jeopardize a patient, disclosure by the physician need not be made. The Court noted, however, that the burden of going forward with the evidence, pertaining to nondisclosure in such cases, rests upon the physician. 464 F.2d at 791.

Finally, in *Canterbury*, the Court stated that to establish the physician's liability, there must be a causal relationship between the physician's failure to disclose information to his patient and damage to the patient. 464 F.2d at 790.

It should be noted that in *Canterbury* the Court did not discuss the requirements of written consent forms to medical treatment. Nor did the Court discuss the liability of a hospital with respect to the disclosure issue.[5]

The Court which established the rule in *Canterbury* subsequently applied that rule in *Henderson v. Milobsky*, 595 F.2d 654

5. An analysis of the *Canterbury* decision appears in Vol. II *Hospital Law Manual* (Health Law Center—Aspen Systems Corporation 1980). In that manual, the *Canterbury* decision is noted as representing a philosophical approach contrary to the reliance upon the self-regulation and restraint of professions. As the *Hospital Law Manual* states in part:

The philosophical shift expressed in the *Canterbury* opinion, while dramatic, is not the most significant aspect of the decision. Rather, the major practical change is that the new rule relieves the patient-plaintiff of the burden of introducing expert testimony as to the professional community standard of disclosure. As previously indicated, the difficulty of securing such testimony constitutes a major obstacle to the prosecution of informed consent claims. By the *Canterbury* rationale, the determinative factor is what a reasonable patient would have considered material, a matter that a lay jury can decide without resort to expert testimony

\* \* \* \* \* \*

To be sure, there is still a substantial role for expert medical testimony in informed consent cases under the new, patient-based rule. It may be needed, for instance, to establish what the risks of the subject procedure were, as well as the availability and relative merits of alternative treatments.

*Hospital Law Manual*—Chapter on Consents at 37.

(C.A., D.C.Cir.1978). In *Henderson*, a patient suffered from continued numbness (paresthesia) upon a portion of his face subsequent to the removal of a wisdom tooth. The patient brought an action against the dental surgeon asserting, *inter alia*, the surgeon's alleged nondisclosure to the patient of the risk of paresthesia.

In *Henderson*, the Court of Appeals affirmed a directed verdict in favor of the surgeon upon the disclosure issue. The Court held that neither the risk of temporary nor of permanent paresthesia was significant enough to give rise to a duty to disclose. The Court rejected the patient's argument that had he known of the risk of paresthesia he would have declined the tooth extraction. 595 F.2d at 658. The Court stated:

> Moving now to the risk of permanent paresthesia, we agree completely with the District Court that the facts shown by the evidence, viewed with maximum favor to appellant, did not generate a duty to disclose. We held in *Canterbury* that the obligation to inform the patient of appreciable risks depends on the need for the treatment, the likelihood that injury will occur, and the seriousness of any injury that could follow. The only evidence on the incidence of the risk in this case came from appellee, who testified that he had encountered only three to five cases of paresthesia—all of which were temporary—in more than 100,000 extractions. Thus, the evidence before the jury could indicate at most that temporary paresthesia would occur no more than .005% of the time—one chance in 20,000—and that permanent paresthesia could be expected in less than one case in 100,000—or no more than .001% of the time. Moreover, the injury risked here— loss of sensation in a small section of the face—is undoubtedly troublesome but hardly disabling. *Canterbury*, by contrast, involved a one percent chance of very serious consequential harm. We agree with the District Court that, on the speculative evidence adduced, no prudent juror could reasonably have considered the risk of permanent paresthesia material to a decision on whether to consent to

the procedure, and no allegation has been made that appellee had reason to know of any special desire on his patient's part to have a greater-than-average knowledge of potential hazards.

595 F.2d at 659.

In *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977), the appellants alleged that a physician negligently failed to advise them that a sterilization operation performed by the physician was not absolutely certain to succeed. Appellant, Mrs. Sard, subsequently became pregnant. The Court of Appeals of Maryland reversed a judgment entered by the lower court for the physician and held that the evidence of the appellants, concerning the physician's disclosure of medical information to the appellants, was sufficient to constitute a jury question.

In *Sard*, the Court recognized that controversies surrounding informed consent actions ordinarily involve: (1) the scope of the duty of the physician to disclose information, (2) whether expert medical testimony is required to prove a standard of disclosure by physicians to their patients and (3) the appropriate test for proving causal connection between the failure to disclose and any resulting injury or damage.

In *Sard*, the existence of two standards of disclosure were recognized by the court, i.e., the "professional standard of care," under which the physician's obligation to disclose is a matter committed to professional judgment and discretion, and the "general reasonableness standard," under which the scope of a physician's duty to disclose therapeutic risks and alternatives is governed by the patient's informational needs. 379 A.2d at 1021. In *Sard*, the court adopted the "general reasonableness standard" and held as follows:

> [T]he scope of the physician's duty to inform is to be measured by the materiality of the information to the decision of the patient. A material risk is one which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding

whether or not to submit to a particular medical treatment or procedure.

379 A.2d at 1022.[6]

With respect to the necessity of expert testimony to establish the "general reasonableness standard" of disclosure, the court in *Sard* held as follows: "We regard as more persuasive the reasoning of the cases that require neither the scope nor the breach of the physician's duty to be established by expert medical testimony." 379 A.2d at 1024. The court, however, qualified its holding concerning expert testimony as follows:

> We are not to be understood as holding, however, that expert medical testimony can be dispensed with entirely in cases of informed consent. Such expert testimony would be required to establish the nature of the risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, the nature of available alternatives to treatment and whether or not disclosure would be detrimental to a patient.

379 A.2d at 1024. *See* n. 5, *supra.*

Finally, with respect to the problem of establishing proximate cause between the failure to disclose and injury, the court in *Sard* recognized the existence of two tests: (1) the "subjective test," i.e., what the patient himself would have done had adequate disclosure been made, and (2) the "objective test," i.e., what a reasonable person in the patient's position would have done had he been fully informed. 379 A.2d at 1024, 1025. In *Sard*, the court adopted the "objective test" and stated as follows:

We hold, therefore, that the causality requirement in cases applying the doctrine of informed consent is to be resolved by an objective test: whether a reasonable person in the patient's position would have withheld consent to the surgery or therapy had all material risks been disclosed. If disclosure of all material risks would not have changed the decision of a reasonable person in the position of the patient, there is no causal connection between nondisclosure and his damage. If, however, disclosure of all material risks would have caused a reasonable person in the position of the patient to refuse the surgery or therapy, a causal connection is shown. Under this rule, the patient's hindsight testimony as to what he would have hypothetically done, though relevant, is not determinative of the issue.

379 A.2d at 1025.

This Court has carefully reviewed the reasonable physician or national standard, the community or local practice standard and the patient need standard. We find the patient need standard, discussed in *Canterbury*, persuasive and the more consistent of the three standards with the fundamental principle that it is the right of every person to determine what shall be done with his or her own body. We find the patient need standard to be the standard most likely to make certain that a patient's consent to a particular method of treatment, such as surgery, was, in fact, an informed consent. Unlike the patient need standard, the focus of the national and local standards of disclosure is upon the medical profession, rather than upon the

---

**6.** In *Sard*, the court stated as follows with respect to the scope of disclosure:

> We stress that a physician is not burdened with the duty of divulging *all* risks, but only those which are material to the intelligent decision of a reasonably prudent patient. Even then, the physician retains a qualified privilege to withhold information on therapeutic grounds, as in those cases where a complete and candid disclosure of possible alternatives and consequences might have a detrimental effect on the physical or psychological well-being of the patient, or where the patient is incapable of giving his consent by reason of mental disability or infancy, or has

> specifically requested that he not be told. Likewise, the physician's duty to disclose is suspended where an emergency of such gravity and urgency exists that it is impractical to obtain the patient's consent. Finally, disclosure is not required where the risk is either known to the patient or is so obvious as to justify presumption of such knowledge, nor is the physician under a duty to discuss the relatively remote risks inherent in common procedures, when it is common knowledge that such risks inherent in the procedure are of very low incidence.

379 A.2d at 1022.

patient. As stated in *Canterbury, supra*: "Respect for the patient's right of self-determination on particular therapy demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves." 464 F.2d at 784.

As indicated above, a physician has a duty to disclose information to his or her patient in order that the patient may give to the physician an informed consent to a particular medical procedure such as surgery. In the case of surgery, the physician ordinarily should disclose to the patient various considerations including: (1) the possibility of the surgery, (2) the risks involved concerning the surgery, (3) alternative methods of treatment, (4) the risks relating to such alternative methods of treatment and (5) the results likely to occur if the patient remains untreated. In evaluating a physician's disclosure of information to his or her patient, relative to whether that patient gave an informed consent to a particular medical procedure such as surgery, this Court hereby adopts the patient need standard, rather than physician disclosure standards based upon national or community medical disclosure practice. Pursuant to the patient need standard, the need of the patient for information material to his or her decision as to method of treatment, such as surgery, is the standard by which the physician's duty to disclose is measured. Under the patient need standard, the disclosure issue is approached from the reasonableness of the physician's disclosure or nondisclosure in terms of what the physician knows or should know to be the patient's informational needs. Therefore, whether a particular medical risk should be disclosed by the physician to the patient under the patient need standard ordinarily depends upon the existence and materiality of that risk with respect to the patient's decision relating to medical treatment.

It is recognized under the patient need standard that in certain situations such as an emergency where harm from failure to treat is imminent or where the physical or emotional result of disclosure could jeopardize a patient, disclosure by the physician may not be feasible. However, the burden of going forward with the evidence, pertaining to nondisclosure, rests upon the physician. *See Prettyman v. Hopkins Motor Co.*, 139 W.Va. 711, 722, 81 S.E.2d 78, 84 (1954).

Finally, we hold that although expert medical testimony is not required under the patient need standard to establish the scope of a physician's duty to disclose medical information to his or her patient, expert medical testimony would ordinarily be required to establish certain matters including: (1) the risks involved concerning a particular method of treatment, (2) alternative methods of treatment, (3) the risks relating to such alternative methods of treatment and (4) the results likely to occur if the patient remains untreated. *See Sard, supra*; n. 5, *supra*.

It should be noted that this Court, by way of the above rulings, is not blazing a new trail in this area of the law. *See* Annot. 88 A.L.R.3d 1008 § 6 (1978). Rather, our rulings today concerning a physician's duty to disclose medical information to his or her patient are generally in line with *Canterbury* and *Sard*, in which cases many previous court rulings are discussed. The *Sard* case is particularly well reasoned.

## II

In the action before this Court, the evidence of the appellants at trial indicated that the appellants did not consent to the transurethral resection performed by Dr. Trapp. Nor did they learn of the operation until the operation had been performed. The appellant and his wife testified that Dr. Trapp stated that the appellant was to go to the hospital for a test relating to the appellant's urinary tract, such test being too painful to be performed in Dr. Trapp's office. According to the appellants, surgery was not mentioned during that office visit.

The appellant was admitted to Ohio Valley Medical Center on October 23, 1974. As a result of the death of his father, the appellant left the hospital but was readmit-

ted on October 28, 1974. At the time of both admissions to the hospital, the appellant signed a hospital form indicating that the appellant consented to treatment, including surgery. It is undisputed that no consent form specifically referring to a transurethral resection was ever signed by the appellants.

The appellants further testified that while the appellant was in the hospital, Dr. Trapp never discussed possible surgery with the appellants prior to the operation. The appellants testified that they were unhappy that the surgery was performed. The appellants indicated to the jury that, as a result of the surgery, the appellant became impotent and, further, suffered pain in his urinary tract.

On the other hand, Dr. Trapp testified that during the office visit of October 8, 1974, he told the appellants that he might perform surgery upon the appellant in the hospital. Dr. Trapp also testified that during that office visit he told the appellants about the surgery, the possible risks of surgery, including impotency, and about alternative methods of treatment.[7] To explain to the appellant his medical problem, Dr. Trapp stated that, during that office visit, he used diagrams and illustrations.

Dr. Trapp further testified that he spoke with the appellant at the hospital on October 29, 1974, prior to the operation and that the appellant confirmed Dr. Trapp's proposed procedure, including the surgery. Immediately subsequent to the cystoscopic examination, Dr. Trapp concluded that the appellant should have the transurethral resection. According to Dr. Trapp, it was not until after the operation that the appellants denied that they consented to the surgery. Finally, Dr. Trapp testified that after the operation the appellant indicated that the appellant was not impotent.

In the appeal before this Court, Dr. Trapp asserts that his disclosure of information to the appellants prior to the operation was sufficiently comprehensive to satisfy the requirements of the patient need standard as well as the national and the community standards of disclosure. Therefore, Dr. Trapp concludes that it was harmless error for the circuit court to adopt the community standard in its instructions to the jury. The instructions in question given as a part of the circuit court's charge to the jury stated as follows:

> The Court instructs the jury that physicians are held, with regard to informing patients and obtaining consent to surgical procedures, to the standard of care established by the care given by other physicians in his community or similar communities in which they practice. Accordingly, if you find by a preponderance of the evidence that Raymond Cross did

---

7. Dr. Trapp testified at trial as follows:

There are reasons I remember his case more than others. In this case I examined him, questioned him and came to the conclusion that he had prostate trouble, probably enlargement of the prostate causing symptoms at the time. I used illustrations to point out the anatomical abnormality involved and showed pictures of the male urinary system and prostate to tell him the form of treatment which I thought he might need. It would require first a cystopic examination to confirm what I thought was present and if it were what I thought it was, enlargement of the prostate, that the prostate should be removed in order to relieve the obstruction. Now I tell the patients that there are medical treatments that have been tried, but they are not successful and not effective and they usually involve the use of hormones which will not reduce the size of the gland; they sometimes prevent enlargement of the gland, but if given will eliminate the man's desire for sex and this has been the major objection to any form of medi-

cal treatment for this condition and I felt the only effective way to treat it would be by surgery. I further point out that the usual complications would be either immediate or delayed. The immediate complication would be in the form of bleeding, which is usually not life threatening, infection sometimes occurs because of the indwelling catheter and the fact the urinary system has to be invaded, it's not always possible to prevent any.

The other thing I point out is that patients will occasionally have incontinence, which is usually very temporary and once healing has occurred that will disappear.

 * * * * * *

The other thing is of course the problem of trying to tell the patient that people complain of impotence after this procedure, but that it is not believed to be caused by the operation. In so doing I show them where the nerves are to the penis and why it should not have any effect and I try to assure them that if they are sexually active before that they should remain so after the procedure.

not consent to the performance of a transurethral resection of the prostate upon him by D. D. Trapp, M.D., and his injuries were proximately caused by this lack of consent, then your verdict should be for the plaintiffs.

The Court instructs the jury, that for a patient to validly consent to medical treatment, such patient must be advised of the possible adverse consequences of such treatment, as would be related to him in the ordinary and reasonable disclosure practices of the average physician practicing in the same field in the same or similar communities. Accordingly, if you find by a preponderance of the evidence that Raymond Cross was not so advised of the possible adverse consequences of a transurethral resection of the prostate, then your verdict should be for the plaintiffs; if you further find that any injury of the plaintiff proximately resulted from the failure of Dr. Trapp to inform the patient properly.

As the record indicates, the appellants objected to the above instructions. Clearly, those instructions were more favorable to Dr. Trapp than instructions would have been if written pursuant to the patient need standard. The effect of the instructions given to the jury adopting the community standard of disclosure cannot be minimized. The existence of disclosure by Dr. Trapp prior to the operation and the scope of that disclosure were the principal issues before the jury. Accordingly, even though the evidence was in conflict and even though Dr. Trapp testified that his disclosure of information to the appellants prior to the operation was comprehensive, the adoption of the community standard by the circuit court in its charge to the jury was necessarily prejudicial to the appellants. Specifically, the jury was left to measure the scope of Dr. Trapp's disclosure of information by the wrong standard. Therefore, we cannot say as a matter of law that it was harmless error for the circuit court to instruct the jury upon the basis of the community standard of disclosure. "An instruction which tends to mislead the jury is erroneous and should be refused." Syl. pt. 6, *Abdulla v. Pittsburgh and Weirton Bus Co.*, 158 W.Va. 592, 213 S.E.2d 810 (1975), citing Syl. pt. 19, *Payne v. Kinder*, 147 W.Va. 352, 127 S.E.2d 726 (1962). We, therefore, set aside the verdict of the jury returned in favor of Dr. Trapp.[8]

### III

An issue this Court must also consider is the liability of appellee, Ohio Valley Medical Center, with respect to the assertion of the appellants that the operation in question was performed without the appellant's consent. The appellants contend that the circuit court committed error in directing a verdict in favor of the hospital. The appellants contend that the hospital improperly failed to make certain that an informed consent was given by the appellant prior to the operation.[9]

8. It should be noted that our holding in this action adopting the patient need standard does not represent a retroactive change in substantive or procedural law. *See* Syl. pt. 5, *Bradley v. Appalachian Power Company*, 163 W.Va. 332, 256 S.E.2d 879 (1979). Prior to this decision, no standard had been adopted by this Court with respect to measuring the scope of disclosure by a physician to his patient of information concerning treatment. We do not believe that an application of the patient need standard to the facts in this action results in injustice.

9. Some states have enacted statutes with respect to hospitals and the issue of consent to treatment. As *Ohio Rev.Code Ann.* § 2317.54 (Page 1977) provides in part: "A hospital shall not be held liable for a physician's failure to obtain an informed consent from his patient prior to a surgical or medical procedure or course of procedures, unless the physician is an employee of the hospital." Furthermore, as provided by *Idaho Code* § 39–4306 (1975):

Responsibility for consent and documentation thereof.—Obtaining consent for such health care is the duty of the attending physician or dentist or of another physician or dentist acting on his or her behalf or actually providing the contemplated care, treatment or procedure; however, a licensed hospital and any medical or dental office lay or professional employee, acting with the approval of such a physician or dentist, may perform the ministerial act of documenting such consent by securing the completion and execution of a form or statement in which the giving of consent for such care is documented by or on behalf of a patient. In performing such a ministerial act, the hospital or medical or dental office lay or professional employee

The record indicates that Dr. Trapp was a private physician with staff privileges at Ohio Valley Medical Center.

In *Cox v. Haworth*, 54 N.C.App. 328, 283 S.E.2d 392 (1981), the plaintiff was admitted to the hospital so that his privately retained physician could perform upon the plaintiff a medical procedure known as a myelogram. During the myelogram, the physician used hospital facilities, was assisted by hospital personnel, and administered drugs to the plaintiff which were provided by the hospital. The plaintiff asserted that the myelogram damaged his spinal cord. The plaintiff's resulting action against the hospital was based upon theories of: (1) *respondeat superior*, (2) corporate negligence and (3) battery. The plaintiff asserted that the hospital was under a duty to, but did not, obtain the plaintiff's informed consent before the physician performed the myelogram.

In *Cox*, the court affirmed a summary judgment in favor of the hospital. The court rejected the plaintiff's theory of *respondeat superior*, because the plaintiff failed to offer proof in response to the evidence of the hospital that the physician was not an agent or employee of the hospital at the time the myelogram was performed. The court also rejected the plaintiff's corporate negligence and battery theories of hospital liability. As the court stated:

> In the case before us, the Coxes [the plaintiff and his wife] allege only that the Hospital was negligent in not obtaining the informed consent of Mr. Cox before the medical procedure was performed. They do not allege negligence by the Hospital in the selection or referral of the physician they privately retained. They do not allege negligence by the Hospital in the performance of the myelogram, in the operation of machinery or equipment during the myelogram, in the staffing of the support personnel who assisted during and after the myelogram, or in the administration of drugs to Mr. Cox. Further, the Complaint contains no allegations of negligence by the Hospital personnel during the myelogram....

This Court has held that if circumstances warrant, a physician has a duty to warn a patient of consequences of a medical procedure. *Brigham v. Hicks*, 44 N.C.App. 152, 260 S.E.2d 435 (1979). The physician in this case was Mr. Cox's own privately retained physician. Any duty to inform Mr. Cox of the risks of the procedures would have been on the privately retained physician, not on the Hospital or its personnel. Consequently, we find that the Hospital had no duty to inform Mr. Cox of the risks and procedures to be used in the administration of the myelogram or to secure his informed consent when Mr. Cox hired his private physician to perform the myelogram.

283 S.E.2d at 395–396.

In *Fiorentino v. Wenger*, 19 N.Y.2d 407, 280 N.Y.S.2d 373, 227 N.E.2d 296 (1967), the plaintiff obtained a judgment in the lower court against a surgeon and hospital for the death of a 14 year old child. That death resulted from an unusual and dangerous medical procedure known as a "spinal-jack" operation. The evidence was in dispute at trial as to whether the surgeon had explained to the decedent's parents the hazards of the operation or the available alternatives. The hospital's director of surgery testified that he knew the nature of the spinal-jack operation. However, there was no dispute that the surgeon who performed the operation was reputable.

In *Fiorentino*, the court stated that the issue was "... whether a private proprietary hospital has an obligation to a patient and his family using its facilities to make certain that they have given an informed consent to an unusual, dangerous operation performed by their privately retained surgeon." 280 N.Y.S.2d at 374, 227 N.E.2d at 297. In dismissing the complaint against the hospital, the court stated that "... it would not be just for a court, having the benefit of hindsight, to impose liability on a hospital for its failure to intervene in the independent physician-patient relationship."

shall not be deemed to have engaged in the practice of medicine or dentistry.

280 N.Y.S.2d at 377, 227 N.E.2d at 300. Furthermore, the Court stated as follows:

Nor would it be fair to impose such an unprecedented liability on a hospital in the absence of facts bringing home to the hospital that the patient was unaware of the dangers and novelty of a medical procedure, or that for medical reasons, the procedure was not indicated, or that in previous instances the surgeon had failed to obtain an informed consent.

280 N.Y.S.2d at 378, 227 N.E.2d at 301.

The process of consenting to medical treatment, especially surgery, is an ongoing process in many cases. Discussion between the physician and his or her patient concerning proposed treatment may very well continue between the time the patient first walks into the physician's office and the time of surgery or other treatment. That process could easily be disrupted rather than facilitated by the involvement of hospital personnel. Unless the hospital is placed upon notice of circumstances more extraordinary than those in the record before this Court, such as where a physician is known to repeatedly employ medical treatment without consent, the hospital should not be held liable where a patient asserts that a particular form of treatment was performed by a privately retained physician without the patient's consent.

■ We hold, therefore, that when a patient asserts that a particular method of medical treatment, such as surgery, was performed by the patient's privately retained physician without the patient's consent, the hospital where that treatment was performed will ordinarily not be held liable to the patient, upon the consent issue, where the physician involved was not an agent or employee of the hospital during the period in question.

IV

As indicated above, written general consent to treatment forms submitted to the appellant by the hospital were signed by the appellant at the time of his two admissions to Ohio Valley Medical Center in October, 1974.[10]

10.

**OHIO VALLEY MEDICAL CENTER**
**Wheeling, West Virginia**
**CONSENT UPON ADMISSION TO HOSPITAL**
**AND MEDICAL TREATMENT**

PATIENT: _____

DATE: _____ TIME: _____ A.M. P.M.

1. I, (or _____ for _____) knowing that I (or _____) am (is) suffering from a condition requiring diagnosis and medical or surgical treatment do hereby voluntarily consent to such diagnostic procedures, laboratory tests and hospital care and to such medical, surgical or x-ray treatment by Dr. _____ his assistants or his designees as is necessary in his judgment.

2. I am aware that the practice of medicine and surgery is not an exact science and I acknowledge that no guarantees have been made to me as to the result of treatments or examination in the hospital.

3. I hereby authorize Ohio Valley General Hospital to retain, preserve and use for scientific or teaching purposes, or dispose of at their convenience, any specimens or tissues taken from by body during my hospitalization.

4. In the interest of improved hospital utilization, I agree to leave the hospital on the day my doctor discharges me.

5. This form has been fully explained to me and I certify that I understand its contents.

_____        _____
Witness                                Signature of Patient

(If patient is unable to consent or is a minor, complete the following):
Patient (is a minor _____ years of age) is unable to consent because _____

_____        _____
Witness                                Closest relative or legal guardian

Upon a review of the above, this Court is of the opinion that written general consent to treatment forms, whether submitted to the patient by a privately retained physician or by hospital personnel, which do not specify any particular type of treatment to which the patient might be subjected, are not adequate standing alone to satisfy a physician's duty under the patient need standard to disclose certain information to his or her patient concerning medical treatment. Furthermore, whether a written consent to treatment form signed by a patient, which form specifies a particular method of treatment and discloses other relevant medical information to the patient, satisfies the disclosure requirements of the patient need standard depends upon the facts and circumstances of each case.[11]

In so holding, we are merely recognizing the practical considerations involved with general or specific consent to treatment forms with respect to the patient need standard. Obviously, a general consent form, such as the one in the action before this Court, signed by a patient does not of itself constitute an informed consent to any particular type of medical treatment. Therefore, the mere existence of such a form has little significance with respect to what a physician may have told his patient concerning treatment.

On the other hand, a detailed, written consent form, specifying a particular type of treatment and disclosing other relevant medical information, may or may not, depending upon the circumstances, satisfy the patient need standard of disclosure. Inasmuch as such forms could be used in situations where they are inappropriate, they should be treated with great caution. For example, extenuating circumstances could invalidate a consent form previously signed by a patient. The medical treatment of patients is of such importance and the circumstances so variable that this Court is of the opinion that all matters in whatever form relevant to a patient's consent to treatment should be considered.

As stated in *Sard, supra*:

In our view the effect to be given a standard consent form is governed by the same principles used in evaluating appellants' claim under the informed consent doctrine. Thus, unless a person has been adequately apprised of the material risks and therapeutic alternatives incident to a proposed treatment, any consent given, be it oral or written, is necessarily ineffectual. (citation omitted). In any event, the authorization is simply one additional piece of evidence for the jury to consider in assessing the merits of appellants' cause of action for informed consent. (citation omitted).

379 A.2d at 1019, n.3. *See also* Annot. 89 A.L.R.3d 32 (1979).

This Court has carefully examined all other errors raised by the appellants not discussed above and finds the same to be without merit.

The order of the Circuit Court of Ohio County, West Virginia, which entered judgment in favor of the appellee, Ohio Valley Medical Center, Inc., is hereby affirmed. However, the final order of the circuit court with respect to the appellee, Dr. Trapp, is hereby reversed.

Affirmed in part; reversed in part.

---

**11.** It should be noted that in the action before this Court, no written consent was ever executed by the appellant reflecting that a specific type of treatment or surgery was to be performed.