375 S.E.2d 184

**Kenwood Junior CATLETT**

v.

**Ian MacQUEEN**

v.

**Timothy D. BENNETT.**

**No. 17634.**

Supreme Court of Appeals
of West Virginia.

Nov. 10, 1988.

Charles A. Kiser, Martinsburg, Thomas A. Schultz, Jr., Harrison & Johnson, Winchester, for Kenwood Junior Catlett.

Gray Silver, III, Martinsburg, for Ian MacQueen.

Richard L. Douglas, Martinsburg, for Timothy Bennett.

PER CURIAM:

In this medical malpractice case, the plaintiff, Kenwood Junior Catlett, appeals a jury verdict rendered in favor of the defendant, Ian J. MacQueen, M.D. The plaintiff assigns as error the exclusion of three color photographs of his injuries, as well as instructional error. For the reasons discussed below, we find no error and affirm the judgment.

## I.

On the morning of December 25, 1982, at approximately 3:30 a.m., the plaintiff was brought to the emergency room at the City Hospital in Martinsburg, suffering from injuries received about one hour earlier in an automobile accident. The plaintiff had been a passenger in a sports car driven by Timothy D. Bennett. While attempting to negotiate a curve at an excessive speed, Mr. Bennett lost control of the vehicle, which then spun across the road and crashed into a tree on the passenger's side.

As a result of the accident, the plaintiff received serious wounds to his feet which became contaminated with roadside dirt and other debris. Other less serious injuries included an abrasion on his right leg, lacerations on his right thigh, and a laceration on his right shoulder. After an emergency room physician and a nurse assessed the nature and extent of the injuries, the nurse called the defendant, who was the orthopedic surgeon on call. The defendant promptly came to the emergency room for the purpose of examining and treating the plaintiff. After the examination was completed, he discussed with the plaintiff the

nature of the injuries and his recommended course of treatment.[1]

The plaintiff signed a consent form and was taken to one of the hospital's operating rooms.[2] There, the defendant performed debridement of the wounds, removing dead tissue, dirt, and other debris from the plaintiff's feet. As consented to by the plaintiff, the defendant amputated three smaller toes on the plaintiff's right foot. During the operative procedure, the defendant placed sutures in the wounds on both of the plaintiff's feet. The parties, and their respective experts, disagreed at trial as to whether sutures were needed, whether the sutures were loosely or tightly placed, whether the placement of the sutures adversely affected the plaintiff's prognosis, and whether more extensive procedures were indicated at the time.

The operation was completed at about 9:00 a.m. on December 25, and the plaintiff was taken from the recovery room to his room about two hours later. Over the next thirty-six hours, the condition of the plaintiff's feet worsened. The defendant then determined that an anaerobic infection[3] had developed in the plaintiff's right foot. After consultation with another orthopedic surgeon in Martinsburg, whose second opinion was requested by the plaintiff's wife, the defendant directed that the plaintiff be transferred by helicopter to the Shock Trauma Center operated by the University of Maryland at Baltimore.

The plaintiff arrived at the Maryland hospital, which was equipped with hyperbaric oxygen[4] for the treatment of anaerobic infections, at around midnight on December 26. The orthopedic surgeon who treated the plaintiff at the University of Maryland, Andrew R. Burgess, M.D., took several color photographs of the plaintiff's feet within about two hours of the plaintiff's arrival. Shortly thereafter, Dr. Burgess amputated the plaintiff's right foot at the ankle level and all of the toes of the plaintiff's left foot. Although the plaintiff's condition stabilized after the operation, Dr. Burgess found it necessary to perform a below-the-knee amputation of the plaintiff's right leg several days later so that the plaintiff could be fitted with a prosthetic device.

On September 7, 1984, the plaintiff filed a medical malpractice action against the defendant in the Circuit Court of Berkeley County. The complaint averred that, as a proximate result of negligent treatment by the defendant, the plaintiff sustained serious and permanent damages, including the loss of the toes of his left foot and the below-the-knee amputation of his right leg, loss of wages and future earning capacity, temporary and permanent disability, and past and future medical bills. The plaintiff

**1.** Conflicting testimony was given at trial concerning the discussions between the plaintiff and the defendant. The plaintiff testified that he recalled the doctor recommending that the three smaller toes of his right foot be amputated. The plaintiff also recalled the defendant asking him to sign a consent form to allow amputation of the three toes on his right foot. The plaintiff testified further, however, that he did not recall the defendant saying anything else. On the other hand, the defendant testified that he told the plaintiff that he believed the plaintiff's right foot could not be saved from amputation, and that without an amputation, there was an increased risk of further infection. According to the defendant, the plaintiff and his family refused amputation of the right foot as recommended, but did consent, at the defendant's urging, to debridement of the wounds and amputation of the three smaller toes of the right foot.

**2.** The consent form provided, in relevant part, that the plaintiff authorized the defendant "and such persons as he may designate to assist and to perform upon me the following operation (or medical procedure): *Exploration and debridement of wounds of both feet and possible amputation of some toes on the [right] foot.*" (Emphasis added). The consent form was signed by the plaintiff and his father. One of the nurses assisting the defendant corroborated the defendant's contention that the plaintiff's consent was limited to debridement of the wounds and amputation of the three smaller toes of the plaintiff's right foot.

**3.** An "anaerobic" infection involves the existence of an "anaerobe" within the body. An "anaerobe" is "[a] microorganism that thrives best, or only, in the absence of oxygen." *Stedman's Medical Dictionary* 59 (5th ed. 1983).

**4.** "Hyperbaric oxygenation" is "an increased amount of oxygen in ... tissues resulting from the administration of oxygen in a compression chamber...." *Id.* at 1011.

demanded judgment for two million dollars plus interest and costs.

The trial of this civil action began on January 21, 1986, and ended when the jury rendered its verdict in the defendant's favor shortly before midnight on January 25, 1986. On February 3, 1986, the circuit court entered a judgment order dismissing the plaintiff's action. The plaintiff then moved that the verdict be set aside and that a new trial be ordered. The trial judge refused the plaintiff's motions at a hearing held on March 24, 1986, and a formal order overruling the plaintiff's motions was entered by the trial court *nunc pro tunc* on September 29, 1986.

## II.

The plaintiff first assigns as error the trial court's refusal to admit into evidence plaintiff's proffered Exhibit Nos. 5, 6, and 8. These exhibits were three photographs of the plaintiff's feet taken upon his arrival at the University of Maryland Shock Trauma Center, nearly forty-eight hours after the automobile accident. Two other photographs taken at the same time, Exhibit Nos. 4 and 7, were admitted into evidence by the trial court.

In a videotaped deposition taken prior to trial, Dr. Burgess, the orthopedic surgeon who performed the amputations, opined that the defendant was negligent in treating the plaintiff. Dr. Burgess contradicted the defendant as to the overall severity of the plaintiff's wounds and made two allegations of negligence against the defendant: (1) that the defendant created an environment favorable to the development of an anaerobic infection by suturing the plaintiff's foot wounds; and (2) that, in order to preserve the soft tissue of the plaintiff's left foot, the defendant should have performed a fasciotomy of the foot to vent pressure and improve circulation therein.[5] Dr. Burgess concluded that the defendant's actions and omissions were substantial factors in increasing the plaintiff's ultimate level of amputation.

The trial court ruled that the videotaped version of Dr. Burgess' testimony could not be admitted into evidence due to technical problems with the videotape. The trial court did, however, admit the transcript of the deposition into evidence after ruling upon the defendant's objections thereto. The most significant of these objections related to introduction of the color photographs of the plaintiff's feet which were referred to, in differing degrees, by Dr. Burgess during his testimony. After reviewing the photographs in light of Dr. Burgess' deposition, the trial court ruled that: (1) the photographs were relevant to the trial; (2) the photographs were gruesome and, therefore, presented a danger of unfair prejudice if admitted; and (3) only those photographs on which Dr. Burgess relied during his deposition, Exhibit Nos. 4 and 7, would be admitted into evidence.

The parties have focused their attention on the danger of unfair prejudice posed by the photographs, and have cited the "gruesome photograph" rule of *State v. Rowe*, 163 W.Va. 593, 259 S.E.2d 26 (1979). We find, however, that the photographs were properly excluded on an alternative ground stated by the trial court, viz., that the photographs were not relied upon by Dr. Burgess in his testimony.

Each of the subject photographs was offered by the plaintiff as pictorial testimony[6] to assist the jury in understanding Dr.

---

5. "Fascia" is "[a] sheet of fibrous tissue that ... encloses muscles and groups of muscles, and separates their several layers or groups." *Stedman's Medical Dictionary* 513 (5th ed. 1983). A "fasciotomy" is an "[i]ncision through a fascia; used in the treatment of certain ... injuries when marked swelling is anticipated which could compromise blood flow...." *Id.* at 516.

Dr. Burgess testified that a fasciotomy should have been performed on the plaintiff's swollen left foot and that the lack of a fasciotomy caused a greater level of amputation on the left foot than was necessary. On the other hand, the defendant and an orthopedic surgeon called as a defense witness testified that a crushing type of injury had been inflicted upon the appellant's left foot and that the resultant pressure from within the foot caused a laceration to burst open, which, in effect, served as a fasciotomy.

6. We explained in *State v. Dunn*, 162 W.Va. 63, 246 S.E.2d 245 (1978), that there are two theories by which photographs may be admitted into evidence. Under the "pictorial testimony" theo-

Burgess' expert testimony. Dr. Burgess identified and briefly described the photographs, which depicted various views of the plaintiff's feet. Exhibit No. 4 was a medial view of the right foot which showed the infectious condition of the toes and a laceration on the dorsum of the foot. Exhibit No. 7 was a medial view of the left foot. While the remainder of the photographs showed angles which differed from those in Exhibit Nos. 4 and 7, they portrayed much of the same areas of the plaintiff's feet.

■ It is well settled that the decision of a trial court to admit or exclude evidence will be sustained on appeal in the absence of an abuse of discretion, as we said in Syllabus Point 7 of *State v. Miller*, 175 W.Va. 616, 336 S.E.2d 910 (1985):

" ' "Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." *State v. Louk*, 171 W.Va. 639, 643, 301 S.E.2d 596, 599 (1983).' Syllabus Point 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983)."

■ We do not find that the trial court abused its discretion in its exclusion of Exhibit Nos. 5, 6, and 8. Dr. Burgess relied almost exclusively on Exhibit Nos. 4 and 7 in his description of the condition of the plaintiff's foot and in his medical opinions. The deposition transcript, which was read to the jury, contained only isolated references to the unadmitted photographs.

Furthermore, every vital point of Dr. Burgess' testimony was illustrated by Exhibit Nos. 4 and 7: that the skin color of the foot was poor and that a fasciotomy was therefore required; that the sutures were placed too tightly on the foot wounds; and that the wounds were less severe when the plaintiff presented himself to the defendant for treatment. We conclude, as did the trial court, that only Exhibit Nos. 4 and 7 would have been of assistance to the jury.

## III.

■ The plaintiff's final two assignments allege instructional error by the trial court. The plaintiff challenges defendant's Instruction Nos. 7 and 15,[7] contending that both of these instructions should have been excluded under the rule that "[a]n instruction which tends to mislead the jury is erroneous and should be refused." Syllabus Point 6, *Cross v. Trapp*, 170 W.Va. 459, 294 S.E.2d 446 (1982).

■ The principles set forth in Instruction No. 7, relating to informed consent, are well settled in West Virginia. We discussed the law concerning consent to surgical procedures in Syllabus Point 1 of *Cross v. Trapp*, 170 W.Va. 459, 294 S.E.2d 446 (1982):

" 'Except in very extreme cases, a surgeon has no legal right to operate upon a patient without his consent, nor upon a child without the consent of its parent or

ry, photographs are admissible as the nonverbal testimony of the sponsor witness. Admissibility is, therefore, conditioned on a verification by that witness that the photographs are faithful and accurate depictions of what they portray. A second theory discussed in *Dunn*, but never expressly adopted by this Court, is the "silent witness" theory. Under that theory, the photograph is deemed to "speak for itself" without the necessity of foundation testimony. Such a photograph is independently probative of what it shows.

7. Instruction No. 7 stated:
"The Court instructs the jury that in West Virginia, except in very extreme cases such as a life-threatening emergency, a surgeon has no legal right to operate upon a patient without his consent. A surgeon who operates on a

patient without first obtaining the consent of the patient or who performs procedures outside the scope of the consent of the patient commits what is known in the law as a battery for which the surgeon can be held liable and made to respond in damages."
Instruction No. 15 stated:
"The Court instructs the jury that the Plaintiff Kenwood Catlett is claiming that the Defendant Ian MacQueen was negligent in the treatment of injuries to him which were caused in the crash of Timothy Bennett's automobile. The law does not hold Defendant MacQueen responsible for injuries that occurred prior to his treatment of Plaintiff Catlett or the damages *necessarily* and proximately flowing from such prior injury."

guardian.' *Browning v. Hoffman,* 90 W.Va. 568, 581, 111 S.E. 492, 497 (1922)."

The accuracy of the instruction is, therefore, not challenged by the plaintiff. Instead, the plaintiff argues that consent was not at issue, and that Instruction No. 7 served only to mislead the jury and divert its attention from the determinative issues in the case. These issues were whether the defendant was negligent in treating the plaintiff and, if so, whether such negligence caused a greater level of amputation than was necessary.

Regarding Instruction No. 15, which exculpated the physician from the initial injury, the plaintiff argues that the language erroneously misled the jury to find for the defendant. For the reasons set forth below, we are not persuaded by these arguments, and we conclude that the jury's verdict against the plaintiff should not be disturbed because Instruction Nos. 7 and 15 were given.

▮ A trial court's authority to give an instruction embodying a particular theory is reviewed by this Court under the "slight evidence" test, as we said in Syllabus Point 2 of *Snedeker v. Rulong,* 69 W.Va. 223, 71 S.E. 180 (1911):

"If there be evidence tending in some appreciable degree to support the theory of proposed instructions, it is not error to give such instructions to the jury, though the evidence be slight, or even insufficient to support a verdict based entirely on such theory."

▮ Additionally, this Court has consistently held that each party is entitled to instructions which present his theory of the case, as we said in Syllabus Point 2 of *Morris v. Parris,* 110 W.Va. 102, 157 S.E. 40 (1931):

"Where conflicting theories of a case are presented by the evidence, each party is entitled to have his view of the case presented to the jury by proper instructions. *Whitmore v. Rodes,* 103 W.Va. 301 [137 S.E. 747]."

*See also Danco, Inc. v. Donahue,* 176 W.Va. 57, 60, 341 S.E.2d 676, 678–79 (1985).

As in *Thornton v. CAMC,* 172 W.Va. 360, 305 S.E.2d 316 (1983), the plaintiff in the present case sought recovery under the "value of a chance" theory, contending that his original injuries had been improperly treated by the defendant, and, as a result, the injuries were aggravated to the extent that unnecessary amputations were required.[8]

The defendant presented two theories of defense. First, he contended that the plaintiff's foot injuries were so severe that the amputation would have been necessary irrespective of the defendant's treatment. Second, he contended that the plaintiff's below-the-knee amputation of the right leg was necessitated, in part, by the restrictiveness of the initial limited consent given by the plaintiff. Specifically, the defendant testified that he discussed with the plaintiff the possibility of performing a Syme's amputation which would have removed some, but not all, of the foot.[9] To be viable, it was essential that such a procedure be performed immediately. The plaintiff, however, consented only to the removal of three toes. The availability of the Syme's procedure was, therefore, lost and the below-the-knee amputation was required. This medical opinion was corroborated by another defense expert.

▮ After reviewing the record in this case, we hold that sufficient evidence was presented to allow the trial court to instruct the jury on the defendant's alterna-

---

8. The "value of a chance" label comes from the plaintiff's argument that the defendant's alleged negligence "eliminated the chance of his [injuries] healing properly, thus proximately causing the [ultimate level of] amputation." *Thornton v. CAMC,* 172 W.Va. 360, 366, 305 S.E.2d 316, 323 (1983). ▮

9. A Syme's amputation involves removal of the forefoot at the ankle with retention of a portion of the heel. *Stedman's Medical Dictionary* 57 (5th ed. 1982). The defendant stated that the procedure, if successful, would have permitted some limited mobility without a prosthesis.

tive defense theories. Because competent evidence existed to support the defendant's limited consent theory, he was entitled to have Instruction No. 7 given by the trial court.

We also believe that Instruction No. 15, when read with the plaintiff's Instruction No. 3 [10] and the defendant's Instruction No. 8,[11] fully informed the jury as to the *governing law, and could not have misled the jury into finding for the defendant. To the contrary, when read as a whole,*[12] the instructions given by the trial court allowed the jury an opportunity to return a verdict in the plaintiff's favor under the rule stated in Syllabus Point 5 of *Thornton:*

> "Where a plaintiff in a malpractice case has demonstrated that a defendant's acts or omissions have increased the risk of harm to the plaintiff and that such increased risk of harm was a substantial factor in bringing about the ultimate injury to the plaintiff, then the defendant is liable for such ultimate injury."

10. The plaintiff's Instruction No. 3 provides:

> "If you believe from a preponderance of the evidence that the Defendant was negligent for failure to perform his professional duty as defined in the other instructions, and, if you further believe from a preponderance of the evidence that the Defendant's negligent actions or inactions increased the risk of harm and that this increased risk of harm was a substantial factor in the ultimate amputations, then you may find your verdict in favor of the Plaintiff and against the Defendant and assess damages in an amount compensating Plaintiff in accordance with other instructions of the Court."

11. The defendant's Instruction No. 8 provides:

> "The Court instructs the jury that where a patient in a medical malpractice case has demonstrated that a physician's acts or omissions have increased the risk of harm to the patient and that such increased risk of harm was a substantial factor in bringing about the ultimate injury to the patient, then the physician is liable for such ultimate injury. However, you are further instructed that when the patient's original injury was so severe that the ultimate or final injury would have resulted, regardless of the propriety or even negligence in the physician's subsequent

## IV.

For the foregoing reasons, the judgment of the Circuit Court of Berkeley County is affirmed.

**AFFIRMED.**

treatment of the patient, then the physician is not liable for such ultimate injury.

> "Therefore, if you believe by a preponderance of the evidence in this case that the Plaintiff Catlett in the crash of the Corvette automobile in the early morning hours of December 25, 1982, suffered injuries and you further find that the Plaintiff Catlett's original *injuries to his right and left feet were so* severe that the same extent of amputation which ultimately resulted to both his right foot and leg and left foot would have been necessary, regardless of the propriety of, or even negligence in, Defendant MacQueen's treatment, then Defendant MacQueen is not liable for such ultimate injury, and your verdict may be for Dr. MacQueen."

12. It is well established under West Virginia law that:

> "Instructions must be read as a whole, and if, when so read, it is apparent they could not have misled the jury, the verdict will not be disturbed, though one of said instructions which is not a binding instruction may have been *susceptible of a doubtful construction* while standing alone."

Syllabus Point 3, *Lambert v. Great Atl. & Pac. Tea Co.,* 155 W.Va. 397, 184 S.E.2d 118 (1971); *see also* Syllabus Point 3, *McAllister v. Weirton Hosp. Co.,* 173 W.Va. 75, 312 S.E.2d 738 (1983).